In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-1922

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MATTHEW HALE,

*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 CR 011—**James T. Moody**[Œ], *Judge.*

---

SUBMITTED MARCH 28, 2006[ŒŒ]—DECIDED MAY 30, 2006

---

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges.*

PER CURIAM. Matthew Hale was convicted after a jury trial on two counts of obstructing justice, 18 U.S.C. § 1503, and one count of soliciting a crime of violence, *id.* § 373, in connection with his resistance to a judgment

---

[Œ] Sitting by designation from the United States District Court for the Northern District of Indiana.

[ŒŒ] After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Fed. R. App. P. 34(a)(2).

entered against his white supremacist organization by
United States District Judge Joan Humphrey Lefkow and
his involvement in a plot to have the judge murdered.
Hale was sentenced to a total of 480 months' imprisonment.

## I.

Hale was the "Pontifex Maximus" of a white supremacist
organization formerly known as the World Church of the
Creator ("World Church"). A law school graduate, Hale was
unable to procure the character and fitness certification
necessary for admission to the state bar of Illinois. After he
obtained no relief through the administrative appeals
process, and after both the Supreme Court of Illinois and
the Supreme Court of the United States denied review,
Hale unsuccessfully brought constitutional challenges in
federal court. *See Hale v. Comm. on Character & Fitness*,
335 F.3d 678 (7th Cir. 2003). He later sought, and was
denied, bar admission in Iowa as well.

In May 2000 the World Church was sued for trademark
infringement by the TE-TA-MA Truth Foundation—Family
of URI, Inc. ("the Foundation"), a religious organization
that operates under the name "Church of the Creator." Both
parties moved for summary judgment, which Judge Lefkow
granted in favor of the World Church. On appeal, however,
we reversed and remanded with instructions to enter
judgment in favor of the Foundation. *TE-TA-MA Truth
Foundation—Family of URI, Inc. v. World Church of the
Creator*, 297 F.3d 662 (7th Cir. 2002). Accordingly,
on November 19, 2002, Judge Lefkow entered a detailed
order requiring the World Church to stop using varia-
tions of the trademarked name "Church of the Creator," to
turn over books and other materials bearing the name
or obliterate any infringing mark from them, and relinquish
custody of the domain names of the World Church's
websites to the Foundation. The Foundation soon returned

to court seeking enforcement of the order after Hale publicly stated that he would not comply. The court granted the Foundation's motion and ordered Hale to show cause why he should not be held in contempt.

By this time Hale was no stranger to law enforcement authorities; he had been under FBI surveillance since before the trademark suit began. In July 1999 a follower, Benjamin Smith, went on a shooting rampage that left two persons dead and nine others wounded. Days after Hale had publicly announced he was denied an Illinois law license, Smith traveled throughout Illinois and Indiana targeting black, Asian, and Jewish victims before committing suicide. Hale gave a eulogy at Smith's memorial service, a recording of which was entered into evidence at his trial. Hale told his followers that "brother Ben Smith was a very good man" and praised Smith's willingness to "take action for his people, not to sit in the easy chair and allow life to go by but to go out into the world and spread our sacred message." Responding to criticism that he had not condemned Smith's actions, Hale said:

> [I]t's not the policy of the church to commit crimes but when you are causing the destruction of the white race, when you FBI, politicians, media, when you are sending the niggers into our neighborhoods, when you are letting them attack white people by the bushel, when you are promoting the destruction of our white people left and right, do not, do not be surprised when a white man of the character and honor of Ben Smith stands up and fights back in the way he did. Do not be surprised when there are white men who say enough is enough, who see our white people be victimized in the streets, who see white women afraid to walk down the street, and who say, enough is enough. I say unto you, my brothers and sisters, the future will see more, more Ben Smiths, not because of what we've done, not because we're violent people but because, when you kick some-

one around, when you persecute people, when you oppress people, people will explode. And they wonder why, once again, we will not condemn Ben Smith. We cannot condemn a man for doing what he feels in his heart is right whether it's outside the tactics of the church or not.

Afterward the FBI began investigating Hale, and a cooperating witness, Tony Evola, infiltrated the World Church. At his very first World Church meeting in March 2000, Evola met Hale and apparently won his trust when he fended off a protestor. At a meeting the following month, Hale asked Evola to be his "head of security" because the previous occupier of the position, Ken Dippold, had betrayed him by cooperating in a civil case brought against the World Church seeking damages for the victims of Benjamin Smith's shooting rampage. As head of security, Evola's duties included arranging Hale's travel and standing by his side during public appearances. Evola was also in charge of the White Berets, the World Church's "elite" fighting force. During his time in Hale's employ, Evola recorded a number of conversations that were ultimately introduced into evidence at Hale's trial. The following discussion of the facts is gleaned primarily from those recordings and from electronic exchanges between Hale and Evola.

In a conversation with Evola and another follower on June 17, 2000, Hale discussed the upcoming "blitz of literature" he was organizing to commemorate the one-year anniversary of Benjamin Smith's death in the hopes of making "big news." Hale recounted Smith's shooting spree, joking that Smith's "aim got better as he went along." Hale laughed while describing in detail the first four shootings. He then commented that Smith "was a good man" and stated: "I always stand by our comrades. If people are gonna fight with me, I'm gonna stand with them." In a conversation on June 23, Hale repeated for Evola and two other followers what he had said to Benjamin Smith upon

meeting him: "[W]e can accomplish a lot more peacefully and legally, you know, straddling the system, one foot on the inside, one foot on the outside . . . . We're legal. We're peaceful. We're non-violent but we, you know, try to undermine the system every chance we can, you know." Hale went on to say that he wished Smith "hadn't done it" but that "he set out to make a point and he did." Smith, he explained, "made us a household name" and for that reason, Hale continued, he would "always remember him and respect him and appreciate him." Hale also lamented that it was becoming more difficult to pursue his agenda peacefully and lawfully. He remarked: "[I]f I don't get my law license, I'm not going to be able to in good faith tell people to obey the law like I've been . . . . I'm not saying that I would . . . resort to illegal acts. I'm not saying that. But I am saying that I think there's going to be a different policy in some ways." When one of his followers responded that "there's gonna be killing and there's gonna be shootin," Hale said, "You know and I agree with you."

In a conversation on June 29, 2000, shortly after the trademark suit had commenced, Hale said of Benjamin Smith's rampage: "[I]t must have been fun while he was doing it." Hale also stated that it was "personally still [his] intention" to follow the law because he was being "watched all the time," but he would not "urge people to follow the law" as it was "up to them" to decide.

The following day, Hale left a message on his "hotline" (a voice mailbox that followers could call to hear recorded messages) announcing that the Supreme Court of the United States had declined to hear his challenge to the denial of his Illinois law license. Hale stated that he could "no longer in good faith and good conscience urge, recommend, or instruct my adherents and supporters in general to obey the laws of this land." Hale declared the United States government "illegitimate" and stated that he and his followers "are free according to our own con-

science to take whatever actions we deem necessary to resist this tyranny." He said that "whatever blood is spilled will be on the hands of those who so severely wronged us today" and urged his followers to "do what is right today to fight for our white race to secure the existence of our people for all time on this planet."

On December 3, 2000, Hale spoke to Evola and another follower about the civil lawsuit against the World Church arising from the Smith shootings. Hale suspected that his former security chief, Ken Dippold—whom he dubbed "a big fat coward"—would testify that Hale had orchestrated Smith's actions. Evola asked Hale, "What are we gonna do about this . . . traitor?" Hale responded, "[A]ll we can do at this point is be legal and peaceful and follow the rules." But he added: "[I]f I could snap my fingers and the bastard would drop dead hideously right now, I'd do it in a heartbeat, you know, but unfortunately, it's not that easy." Later Hale remarked: "If somebody came to me and said . . . I have the means to make sure that Polar Bear doesn't continue with this bullshit and I'd say hey, I don't want to know about it . . . I have no legal obligation to like tell Polar Bear somebody doesn't like him."

On December 17, 2000, Evola and Hale spoke in an Internet chatroom. Evola asked Hale if he had considered Evola's prior disclosure that he had a cousin who could take care of "the rat." Hale replied, "Of course, it is very important that I be able to say truthfully that I have never advocated anything illegal," and later he elaborated: "I know that it should be legal to dispose of big rats. So I wouldn't mind if something happens to big rats . . . . But I would never want to involve myself in such things."

On January 11, 2001, Evola recorded a conversation with Hale at Hale's father's home (the headquarters of the World Church). Evola told Hale that "everything's in motion" and that he needed a picture or an address to

give to his cousin's "friends." Hale responded, "I think it would be best, you know, I think it would be best that nothing happened." Evola protested, and Hale explained that Dippold had "already been deposed" so killing him would not help their litigation position and would only draw suspicion. Hale added that he was close to getting a law license in Iowa and did not want to jeopardize his chances with negative publicity because the World Church would "automatically" be blamed. Evola persisted but Hale was firm: "I'm gonna have to say no to this and I have to say no for a number of reasons." Evola offered to provide Hale with an alibi for the murder, and Hale declined because "what I would be doing or what I would be authorizing would be grounds for disbarment if I had a license and I just hate to go [sic] that." Evola told Hale that "bad things happen to people all the time" and implored that "all I need is an address." At that point Hale stated he already had mailed the address to Evola "just for your information only." Hale expressed concern that "it might hurt us" and reiterated: "I just want it clear. I've never given my authorization for this." Again Evola said he just needed the address, and Hale replied it had been sent "just because you happen to have other addresses." Evola asked questions about the layout of Dippold's apartment, and Hale answered that he couldn't "go into" anything like that because "I can't further this." After more talk about his upcoming hearing before representatives of the Iowa bar, Hale said they were "speaking in theoretical terms" and he didn't "want to know about these things." The men discussed other subjects until Evola returned to the subject of Dippold. Hale stated, "I just want to say that I can't approve," and later he was emphatic: "I don't want to ever hear about it again." The next day Hale sent an email to Evola about the "idea" and stated, "I must veto it." Hale wrote, "You are very persuasive and obviously I think extremely well of you for your idea," but he concluded, "I must instruct you not to proceed."

In another online chat in August 2001, Hale told Evola that a church member, Dan Hassett, was attempting to remove Hale from his position as Pontifex Maximus. Evola wrote, "Maybe he has to go?" but Hale did not respond. In November, Hale forwarded to Evola an abrasive email received from former church member Pat Langballe and asked Evola to "persuade him to never say such sick crap to me again." In December, Evola offered to do to Langballe what "we were gonna do to Dippold," but Hale declined, suggesting instead that Evola should just scare Langballe into treating him with more respect. Later in the conversation, Hale stated, "I have to be able to take a polygraph if ever it comes up and pass it, if I'm ever asked if I have ever ordered, instructed, or encouraged illegal activity, I want to be able to pass that polygraph." In May 2002, as the discord between Hale and Hassett escalated, Evola once again asked Hale "what you want done with him," and Hale explained that he had reported Hassett to the police for stealing funds from the church and hoped he would be arrested.

All this was a prelude to the events of late 2002 leading to Hale's arrest. In November, after Judge Lefkow issued the order requiring the World Church to cease using its trademarked name, Hale penned a tract entitled "Rigged Court System Declares War on Church" and sent it to his followers. Hale wrote that the order "places our Church in a state of war with this federal judge and any acting on authority of her kangaroo court." Hale branded the mandate a "book burning order," suggesting to his followers that all World Church literature—including their guiding light, *The White Man's Bible*—would have to be destroyed. Though the World Church was represented by counsel, Hale personally sent a letter to Judge Lefkow on December 12, 2002, complaining that "gross injustice" and "fraud" had occurred in the case. He also wrote that he was no longer in control of World Church activities, and that "from [his] understand-

ing of the Court's order [he had] no material in [his] control or possession that falls afoul of it."

On December 4, 2002, just days after Hale disseminated his manifesto, he emailed Evola and asked him to locate the home address of "Judge Joan H. Lefkow, PROBABLE JEW OR MARRIED TO JEW," as well as the home addresses of the three attorneys, all male, who represented the Foundation in the trademark case. Hale labeled two of the lawyers "JEW" and the other "TRAITOR WHITE." He concluded the message by stating: "Any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator according to the dictates of his own conscience."

On December 5, Evola went to Hale's home unannounced to discuss the email "about the Jew judge" and, in particular, Hale's request to locate her home address:

> Hale: That information, yes, for educational purposes and for whatever reason you wish it to be.
>
> Evola: Are we gonna . . . I'm workin' on it. I, I got a way of getting it. Ah, when we get it, we gonna exterminate the rat?
>
> Hale: Well, whatever you wanna do. . .
>
> Evola: Jew rat?
>
> Hale: . . . basically, it's, you know? Ah, my position's always been that I, you know, I'm gonna fight within the law and but ah, that information's been pro-, provided. If you wish to, ah, do anything yourself, you can, you know?
>
> Evola: Okay.
>
> Hale: So that makes it clear.
>
> Evola: Consider it done.
>
> Hale: Good.

Hale asked Evola to send him the address once he learned it so that Hale could post it on the Internet.

On December 9, Evola sent an email to Hale announcing:

I called the exterminator I know about the rat problem we talked about. The guy is good and does a good quiet job. You have to know where rats hide and he think [sic] he located her. He is working to get rid of the femala [sic] rat right now.

Hale did not reply, but an electronic receipt confirms that he opened the message.

On December 17, Evola appeared unannounced at Hale's home to discuss the plan. Hale did not want to discuss the matter because he assumed that he was "always being listened to, watched, monitored." When Evola mentioned "exterminating the rat," Hale answered, "I can't be a party to such a thing" and lamented that Evola was putting him "in an impossible situation." Hale expressed his concern that "there's a federal statute that makes it . . . an imprisonable offense to know about a crime that's to be occurred . . . without telling anybody." Evola stated that the plan was already in motion and that it was costing him more than he expected; he asked Hale if there were "two trusted brothers that could help out with this." Hale responded, "I can't take any steps to further anything illegal, ever." Evola then asked if he could stay with Hale "when this stuff does come to happen," and Hale refused, explaining that he was concerned about being considered "some kind of accessory in something I do not want to be an accessory in." Hale later stated: "I'm not telling you to do anything, you know. Either way." "[W]hatever a person does," he added, "is according to the dictates of their own conscience." Evola again alluded to compensating the assassins and mentioned being "a couple hundred short." Hale responded, "I just can't provide anything." Hale stated

that he might "have a smile on his face" if he were to read in a newspaper that "something happens to certain creepy people" but that he could not "be any kind of party." When Evola discussed the trustworthiness of "his cousin's friends," Hale replied, "[O]f course, we're talking about Little League baseball, aren't we?" Hale asked Evola not to turn up unannounced at his home again.

Hale was arrested in Chicago on January 8, 2003, when he appeared for a contempt hearing for his refusal to comply with Judge Lefkow's order in the trademark case. Pursuant to a third superceding indictment filed in October 2003, he was charged with three counts of obstructing justice, 18 U.S.C. § 1503, and two counts of soliciting a crime of violence, *id.* § 373. The latter counts separately charged Hale with soliciting Tony Evola and another follower named Jon Fox to murder Judge Lefkow. The obstruction charges concerned (1) Hale's letter of December 12, 2002, falsely advising Judge Lefkow that he possessed no materials that violated the court's order; (2) his attempts to thwart Judge Lefkow in the discharge of her duties by soliciting her murder; and (3) his alleged directives to his father to lie to the grand jury.

Before trial the government notified Hale of its intent to introduce testimony and recorded conversations regarding Hale's "relationship with Ben Smith" and his "conduct on the days immediately following the Smith shooting spree." The government, citing Federal Rule of Evidence 404(b), argued that the proposed evidence was "strongly corroborative" of Hale's "intent in the solicitation case." Hale objected, arguing that evidence concerning Smith would be inflammatory and its probative value, if any, outweighed by its prejudicial effect, *see* Fed. R. Evid. 403. The district court deferred its ruling until the evidence was presented at trial.

Hale was tried before a jury in April 2004. At trial the government called James Burnett, a former member of the World Church and former assistant to Hale. When the government began to question Burnett about Benjamin Smith, Hale objected. The government responded that the jury needed to hear Hale's favorable comments about Smith in order to properly interpret his other remarks including the claims that he always encouraged his followers to act within the law. The government argued that Hale's refusal to condemn Smith's murderous rampage and his outright praise of Smith were prime examples that his instructions to act within the law were not meant to be taken seriously. The district court allowed Burnett to testify, but admonished the government to "stay away from anything that's going to be inherent in saying that Hale had anything to do with Ben Smith." The district court offered to give a limiting instruction to the jury, but Hale's counsel replied, "[W]e think it's so prejudicial that we don't want to highlight it." The district court encouraged counsel to notify the court at any time should he change his mind and want a limiting instruction. Burnett then testified about two conversations during which Hale opined that Smith's shootings were "perfectly moral" because the victims were "not white." According to Burnett, Hale also stated that he wished Smith "would have killed more race traitors." It was through Burnett that the government introduced the recording of Hale's eulogy of Smith.

Hale renewed his objection when the government later sought to introduce through Tony Evola the recorded conversations and Internet communications the two had regarding Smith. Hale's attorneys singled out portions of the transcripts they considered particularly inflammatory, including Hale's jokes about the victims, his racial slurs, and his comment that Smith must have had fun during his rampage. The district court initially ruled in favor of Hale, concluding that the probative value of the

evidence "is just outweighed by the prejudice." But when the government pressed its position that the evidence was highly probative of the specific-intent element of § 373, the district court reconsidered: "[T]his case is about a defendant who . . . can be said to talk out of both sides of his mouth. The evidence the defense objects to is probative of which statements the defendant wanted Mr. Evola to understand or meant seriously; and, therefore, it's highly probative of his intent." The court added that it viewed the evidence as outside the scope of Rule 404(b) because that rule "doesn't preclude evidence probative of intent in a specific intent crime, which is what we've got here." Instead the court characterized the admissibility of the evidence as a consideration under Rule 403 and concluded that the "probative value is not outweighed by any unfair prejudice to the defendant." The defense again declined an instruction that would have admonished the jury not to consider the evidence for a purpose other than to establish the element of intent.

The specter of Benjamin Smith returned during closing argument when the government, as expected, reminded the jury that Hale had made a hero out of a follower who killed two people. And during rebuttal the prosecutor stated: "The government had evidence that the defendant had a member of his organization kill two people and shoot lots of others." Hale did not object contemporaneously to the statement, but in his motion for a new trial he argued that the remark was so prejudicial as to have rendered his trial fundamentally unfair. The district judge expressed "shock" at seeing the prosecutor's precise words in the transcript because they had not caught the court's attention while listening to the live argument. Ultimately, however, the court concluded that the comment was understood "simply as a reference to the fact that the shootings occurred, not that Hale orchestrated the shootings." The court cited the context in which the remark was made, the various mean-

ings that might be given the word "had," and the absence of an objection. Applying the five-factor test used to analyze whether improper argument renders a trial so unfair as to amount to a denial of due process, *see United States v. Miller*, 199 F.3d 416, 422 (7th Cir. 1999), the court concluded that the challenged statement did not rise to that level.

The jury found Hale guilty on one of two counts of soliciting a crime of violence and on all three counts of obstructing justice. After the verdicts Hale renewed his earlier motions for judgment of acquittal, *see* Fed. R. Crim. P. 29(c), which the district court granted only as to the obstruction count relating to Hale's alleged attempts to influence his father's testimony before the grand jury. Thus Hale was ultimately convicted of solicitation and obstruction in connection with his efforts to have Judge Lefkow killed, and obstruction in connection with his letter of December 12, 2002, to the judge. The solicitation conviction resulted from Hale's dealings with Tony Evola; the jury found Hale not guilty of soliciting Jon Fox.

Hale was sentenced on April 26, 2005. In light of *United States v. Booker*, 543 U.S. 220 (2005), the district court acknowledged that the sentencing guidelines were advisory but that it was nevertheless required to calculate and consider the applicable guidelines range. For the first obstruction conviction—the one pertaining to Hale's letter to Judge Lefkow—the district court calculated an offense level of 12 after making no adjustments to the base offense level found in U.S.S.G. § 2J1.2(a). As for the second obstruction conviction, which pertains to Hale's attempts to impede Judge Lefkow in the discharge of her duties by soliciting her murder, the district court calculated an adjusted offense level of 23, after adding upward adjustments because the offense involved threatening to cause physical injury, *see* U.S.S.G. § 2J1.2(b)(1), and because

the crime was motivated by Judge Lefkow's status as a government officer, *see id.* § 3A1.2(a)(1)(A).

On the count of soliciting a crime of violence, the district court began with a base offense level of 28, *see* U.S.S.G. § 2A1.5(a), and again added the three-level "official victim" adjustment, *see id.* § 3A1.2(a)(1)(A), as well as a two-level upward adjustment for obstruction of justice, *see id.* § 3C1.1. The latter stemmed from letters Hale sent while he was awaiting trial, in which he attempted to convince Jon Fox to testify falsely that Hale had known all along that Evola was a government informant and that Hale could not possibly have intended any harm to Judge Lefkow. Finally, over Hale's objection, the district court applied U.S.S.G. § 3A1.4 to increase the offense level by 12 levels and the criminal history category from Category I to Category VI because the solicitation "involved, or was intended to promote, a federal crime of terrorism."

The resulting total offense level of 45, in combination with the criminal history category of VI, yielded an advisory guidelines sentence of life imprisonment. After addressing Hale's objections at length, the district sentenced him to a total of 480 months' imprisonment. That term equals the maximum statutory penalties of 20 years for the solicitation count and 10 years for each obstruction of justice count.

## II.

Hale appeals, challenging (1) the sufficiency of the evidence underlying his convictions for solicitation and obstruction in connection with the plan to kill Judge Lefkow; (2) the admission of evidence relating to Benjamin Smith and the comment in rebuttal appearing to blame Hale for Smith's shooting rampage; and (3) his sentence. Hale had counsel at trial but has elected to represent himself on appeal.

A.  Sufficiency of the evidence

Hale argues that no rational trier of fact could have found beyond a reasonable doubt that he solicited Tony Evola to murder Judge Lefkow. He contends that his conversation with Evola on December 17, 2002, demonstrates conclusively that he opposed Evola's plan and that no rational jury could have concluded that his comments suggesting otherwise were meant to be taken seriously. According to Hale, the government's evidence actually exonerates him because it establishes that he believed Evola intended to kill opposing counsel in the trademark case, whose murder he "had a greater motive to 'solicit.'" Hale also contends that, if the evidence is insufficient to support the conviction for solicitation, the related conviction for obstruction of justice must also be vacated.

When reviewing challenges to the sufficiency of the evidence, we view all evidence in the light most favorable to the government. *See United States v. Dumeisi*, 424 F.3d 566, 581 (7th Cir. 2005). We will reverse a jury's verdict only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Moore*, 425 F.3d 1061, 1072 (7th Cir. 2005); *Dumeisi*, 424 F.3d at 581. The appellant's hurdle, as we have often stated, is "nearly insurmountable." *See, e.g.*, *United States v. Caldwell*, 423 F.3d 754, 757 (7th Cir. 2005); *United States v. King*, 356 F.3d 774, 779 (7th Cir. 2004); *United States v. Brown*, 328 F.3d 352, 355 (7th Cir. 2003).

In order to meet its burden of proof on the solicitation count, the government had to establish (1) with "strongly corroborative circumstances" that Hale intended for Tony Evola to arrange the murder of Judge Lefkow; and (2) that Hale solicited, commanded, induced, or otherwise tried to persuade Evola to carry out the crime. 18 U.S.C. § 373; *see United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir. 1994); *United States v. Razo-Leora*, 961 F.2d 1140, 1147 n.6

(5th Cir. 1992); *United States v. Korab*, 893 F.2d 212, 215 (9th Cir. 1989).

Taking the second element first: the government had to prove that Hale "solicited, commanded, induced, or otherwise tried to persuade" Evola to carry out a violent crime. The government argues that the solicitation was accomplished "through coded and disguised language." Asking Evola to locate Judge Lefkow's home address "for whatever reason you wish it to be" was, according to the government, "Hale's code for approving the attack." For his part, Hale all but concedes that there was adequate evidence with respect to this element; he seems to accept that the government proved he solicited the murder of *someone*, just not Judge Lefkow.

We conclude that there is sufficient evidence in the record to support the jury's finding on the solicitation element. Hale knew that Evola was willing to arrange murder on his behalf; he had offered to do so on several previous occasions, and Hale had engaged him in serious discussion concerning at least one of those proposed victims. Hale also knew that securing a proposed victim's home address was a preliminary step in Evola's process; it is through that lens that the government asked the jury to read Hale's email of December 4, 2002, asking Evola to acquire Judge Lefkow's home address. Evola followed up Hale's email by visiting him the next day and making it clear that he interpreted the email as a suggestion to "exterminate the rat." When Hale indicated that he did not want to be involved but that Evola was free to act himself, Evola said, "Consider it done," to which Hale replied, "Good." Unlike his repudiation of Evola's earlier plots, Hale did not "veto" Evola's plan after this conversation; in fact, Hale responded with silence to Evola's email of December 9, which can be read only as conveying to Hale that the "exterminator" had located Judge Lefkow and was "working to get rid of" her. In their conversation on December 17, Hale protested that he

could not be involved in illegal activity in any way. In the same conversation, however, he mentioned that he would have a smile on his face if he was to read in a newspaper that "something happens to certain creepy people." As the government has maintained, Hale tried to "create 'plausible deniability' in the event his conversation was being monitored." Under these circumstances, we have no difficulty concluding that a jury could find from the evidence that Hale's conduct was a call to action, not a passive failure to intervene to stop another's crime or, as Hale would have us believe, disapproval of Evola's stated preparations to kill Judge Lefkow. The jury believed the government's theory rather than Hale's, and it is not our place to reweigh the evidence, *see Brown*, 328 F.3d at 355.

Having decided that a rational jury could conclude that Hale tried to persuade Evola to act, we now examine whether the government met its burden of producing evidence "strongly corroborative" of Hale's intent that Evola murder Judge Lefkow. 18 U.S.C. § 373; *see Rahman*, 34 F.3d at 1337. Examples of circumstances "strongly corroborative" of intent include the defendant offering or promising payment or another benefit in exchange for committing the offense; threatening harm or other detriment for refusing to commit the offense; repeatedly soliciting or discussing at length in soliciting the commission of the offense, or making explicit that the solicitation is serious; believing or knowing that the person solicited had previously committed similar offenses; and acquiring weapons, tools, or information for use in committing the offense, or making other apparent preparations for its commission. *United States v. Gabriel*, 810 F.2d 627, 635 (7th Cir. 1987) (citing S. Rep. No. 307, 97th Cong., 1st Sess. 183 (1982)); *United States v. McNeill*, 887 F.2d 448, 450 (3d Cir. 1989). These examples are not exclusive, nor are they conclusive indicators of intent to solicit. *Gabriel,* 810 F.2d at 635. The existence of strongly corroborating circumstances is a question of fact for the jury. *See id.* at n.5.

We conclude that there was sufficient evidence from which the jury could determine that Hale possessed the requisite intent. Hale provided Evola with Judge Lefkow's name and business address in order to help him locate the judge's home address. On December 17, 2002, Hale and Evola discussed at length the plan to have the judge murdered, albeit in oblique terms. And Hale had every reason to believe that Evola would arrange to have Judge Lefkow killed at his request as Evola had offered to provide the same service with respect to Ken Dippold, Dan Hassett, and Pat Langballe. Hale's suggestion to Evola that he should do "whatever you wanna do" to Judge Lefkow thus evinces Hale's intent to have the judge murdered. And Hale made his intent patent when he sent Evola an email with the judge's name and business address along with the admonition, "Any action of any kind against those seeking to destroy our religious liberties is entirely up to each and every Creator according to the dictates of his own conscience"; Evola's prior offers to "take care of" people established exactly what actions would be in accord with the dictates of his conscience. Hale cannot pretend that Evola did not tell him repeatedly over the course of their acquaintance that he had "friends" willing to perform acts of violence. And Hale made his desire explicit by replying with "Good" when Evola told him on December 5 that the plan to "exterminate the rat" was as good as done. Hale's insistence that he thought Evola was talking about someone else on December 5 is a frivolous argument on this record, particularly because in the days that followed Evola identified the target in language that pointed to the judge alone, but Hale said nothing to suggest that a misunderstanding had occurred. Evola's email to Hale on December 9 assured Hale that the "exterminator" he had called "located *her*" and was "working to get rid of the *femala* [sic] rat right now." Judge Lefkow was the only woman on the list that Hale sent on December 4, so his defense that he was confused about the intended victim is unconvincing. Hale's inaction after

opening Evola's email of December 9 stands in stark contrast to his "veto" of Evola's plan for Ken Dippold and is strong evidence that it was the judge he wanted killed.

Hale's statements that he did not wish to participate in illegal conduct do not call into question the jury's findings with respect to his intent. The government convincingly portrayed Hale as a leader who encouraged each follower to act "according to the dictates of his own conscience"—in reality Hale's conscience—while verbalizing his own commitment to following the law. Hale never criticized Evola's desire to inflict harm on Hale's enemies even as he attempted to insulate himself from blame. When Evola informed Hale that a plan was in motion to assassinate "traitor" Ken Dippold, Hale told Evola that he thought "extremely well" of him for his idea although he ultimately canceled the plan because he was concerned that he could be personally implicated. Likewise, with respect to Benjamin Smith, Hale repeatedly stated that the World Church operated within the confines of the law but nevertheless refused to condemn Smith's actions and painted Smith as a martyr to the cause of white supremacy. This pattern was consistent with Hale's behavior when Evola offered to have Judge Lefkow killed; he professed his own desire to follow the law but encouraged Evola to do whatever he wanted. In *Gabriel*, the appellants who had been convicted of soliciting the arson of their businesses argued that their attempt to postpone the crime and their refusal to supply the arsonist with alcohol for the fire and keys proved that they were not serious about the arson. We concluded that the jury could have inferred that their actions "were means of distancing themselves from the planned arsons and not designed to rebuff or discourage" the crime. *Gabriel*, 810 F.2d at 635-36. In this case too it was up to the jury to decide between competing views of the evidence, and it accepted the government's theory that Hale's refusal to overtly help with the crime and

his ruminations on his innocence masked his true intention that Evola carry out their plan. We will not substitute our judgment for the jury's. *See United States v. LaShay*, 417 F.3d 715, 718 (7th Cir. 2005).

### B. Evidentiary Rulings

Hale challenges the district court's admission of testimony and recorded conversations concerning Hale's positive comments about Benjamin Smith. Hale argues that this evidence should have been excluded under Federal Rule of Evidence 404(b) because it had "zero" probative value and was unfairly prejudicial. *See United States v. Robinson*, 161 F.3d 463, 467 (7th Cir. 1998).

Rule 404(b) "forbids the use of evidence of a defendant's history of illegal or unethical acts to prove that he is a person of bad character and likely therefore to have committed the crime of which he is accused in the present case, or perhaps some other, undetected crime for which he should be punished." *United States v. Paladino*, 401 F.3d 471, 474-75 (7th Cir. 2005). If the evidence is relevant to another issue, such as intent, Rule 404(b) is not a basis for exclusion. *See United States v. Macedo*, 406 F.3d 778, 792 (7th Cir. 2005). Neither does the rule bar the admission of evidence of acts so "inextricably intertwined" with, or "intricately related" to, charged conduct that it helps the factfinder form a more complete picture of the criminal activity. *See Paladino*, 401 F.3d at 475; *United States v. Gougis*, 432 F.3d 735, 742 (7th Cir. 2005). The evidence must of course be relevant; it must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; *see United States v. Price*, 418 F.3d 771, 778 (7th Cir. 2005). But even relevant evidence will be excluded if its probative

value is outweighed by the danger of unfair prejudice. Fed.
R. Evid. 403; *see Gougis*, 432 F.3d at 743.

We review the district court's evidentiary rulings for
an abuse of discretion. *See United States v. Turner*, 400 F.3d
491, 499 (7th Cir. 2005). We give special deference to the
district court's assessment of the balance between probative
value and prejudice because that court is in the best
position to make such assessments. *See id*. As the district
court phrased it, the evidence pertaining to Smith was
probative in that it demonstrates that Hale was someone
who "talk[ed] out of both sides of his mouth." Hale's reaction
to the Smith shootings fit into the government's mosaic of
evidence portraying him as a leader eager to accept the
"benefit" of his followers' actions but take no responsibility
for them. Hale welcomed the publicity that he and the
World Church experienced after the Smith shootings, and
though he continued to profess a personal philosophy of
clean living, he essentially encouraged his followers to do
whatever they pleased, well aware of the lengths to which
some might go. The evidence relating to Smith provided
context for the jurors when hearing about Hale's dealings
with Evola; it allowed them to decide whether Hale was
trying to insulate himself from culpability while orchestrat-
ing a crime or whether he was merely talking to his friend
Tony about "Little League baseball." Hale's reaction to
the Smith shootings, above all, sent a message to his
followers about how he expected them to proceed in the
future, about who a model "brother" was. In a solicita-
tion case—which hinges on the defendant's relationship to
the ultimate actor—such evidence is probative.

On the other side of the scale, the potential prejudice was
also significant. Hale's remarks consisted of kind words
about a man who had briefly terrorized the community just
a few years before and jokes and slurs aimed at the victims.
There is the risk that listening to Hale's comments could
engender in the jurors a desire to hold him responsible for

Smith's crimes or punish him for his noxious views. That possibility admittedly troubled the district court, but we note that Hale's counsel twice rejected the court's offer of a limiting instruction, a device that we frequently have recognized as an effective means of preventing the jury from deciding a case on improper grounds. *See United States v. Chavis*, 429 F.3d 662, 688-69 (7th Cir. 2005); *United States v. Puckett*, 405 F.3d 589, 599 (7th Cir. 2005). We realize that counsel made a strategic decision not to underscore the evidence, but that strategy also conveys Hale's contemporaneous belief that accepting the risk of misuse was preferable to focusing the jury on a proper use of the evidence. We find it to be a close question but we cannot quarrel with the district court's deliberative decision to admit the challenged evidence. *See United States v. Toro*, 359 F.3d 879, 884-85 (7th Cir. 2004).

Hale, though, argues that the prejudice must be measured in light of the prosecutor's remark during his rebuttal argument that "the government had evidence that the defendant had a member of his organization kill two people and shoot lots of others." Hale contends that this statement violated the district court's admonition not to link Hale to the Benjamin Smith shootings and "poisoned" the trial. For its part the government concedes that, in isolation, the statement "could be construed as arguing that defendant directly ordered Smith to engage in the shooting spree," but argues that any error was harmless.

Hale's argument is better characterized as a claim of prosecutorial misconduct separate from the district court's evidentiary ruling. In analyzing such claims, we first determine whether the prosecutor's remark was improper. *United States v. Wesley*, 422 F.3d 509, 515 (7th Cir. 2005). If so, and if the remark was generally improper but not directed at a specific constitutional right, we consider the remark in light of the entire record and evaluate whether

the defendant was deprived of a fair trial. *Id.* Our ultimate concern is whether improper argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden vs. Wainwright*, 477 U.S. 168, 181 (1986) (quotation marks and citation omitted); *United States v. Love*, 336 F.3d 643, 647 (7th Cir. 2003). We consider (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated specific rights of the accused; (3) whether the defendant invited the response; (4) the efficacy of curative instructions; (5) the defendant's opportunity to rebut; and, most importantly, (6) the weight of the evidence. *See Love*, 336 F.3d at 647-48. And because Hale did not object to the prosecutor's rebuttal at trial, he has the added burden of demonstrating plain error. *United States v. Washington*, 417 F.3d 780, 786 (7th Cir. 2005). This requires him to establish not only that he was deprived of a fair trial, but that the outcome of the proceedings would have been different absent the improper remark. *United States v. Della Rose*, 403 F.3d 891, 906 (7th Cir. 2005); *United States v. Sandoval*, 347 F.3d 627, 631 (7th Cir. 2003).

Like the district court, we are perplexed by the government's explanations for the comment. During posttrial proceedings, the government defended the remark as a fair inference from the evidence and an appropriate rebuttal to defense counsel's own argument that the government had been working to "set up" Hale since the Smith shootings. The district court deemed this position "surprising and troubling" in that it suggested that "the government intentionally reneged on its promise to the court and to defense counsel" that it would not blame Hale for Smith's rampage. The district court was willing to assume, however, that the government was merely casting for the best argument to justify a slip of the tongue. Apparently ungrateful for this allowance, the government equivocates and first tells us that it "stands by" its position that the remark

was appropriate and supported by the record (this despite being "equally as shocked as the district court that this line appeared in the record"). If that is so, then the government confirms the district court's fear that it deliberately violated the court's instruction. Worse still, we cannot agree that the statement is supported by the evidence, which convincingly shows Hale's delight at Smith's crimes but not his prior approval. The import of the statement, read literally and in isolation, is that the government "had evidence" that was not admitted at trial showing that Hale orchestrated the Smith shootings, an inference that is "clearly improper." *See United States v. White*, 222 F.3d 363, 370 (7th Cir. 2000). Ultimately, however, the government steps back from its defense of the remark, describing as "particularly accurate" the district court's view that the prosecutor "misspoke in the heat of the moment" and attempted to justify the errant comment instead of acknowledging it. We are not charged with deciding whether the remark was made deliberately or accidentally, but the government's reluctance to fully disavow it only adds weight to Hale's argument.

Nevertheless, Hale has a steep hill to climb. The remark was improper, but we agree with the district court that Hale was not prejudiced. Though he could not reply to the rebuttal argument, we are not inclined to give great weight to this factor when the record suggests that no one in the courtroom noticed the remark. The district court was in a better position to assess its impact, *see United States v. Mealy*, 851 F.2d 890, 903 (7th Cir. 1988), and the court concluded that the remark was "taken by all" as a reminder that the shootings occurred rather than an assertion that Hale ordered them. This view is corroborated by Hale's failure to object to this statement even though counsel objected frequently throughout the prosecutor's rebuttal. And the surrounding context also went far in reducing the prejudicial effect:

Weisman:  As to Mr. Evola, before Tony Evola even had any conversations with the defendant, we knew a lot about him. Ben Smith killed two people, and he thought that was—

Durkin:  Judge, I object to the prosecutor's use of "we" as putting his own integrity at issue here.

The Court:  I think his use of the word "we," probably the government I am assuming.

Weisman:  The government had evidence that the defendant had a member of his organization kill two people and shoot lots of others. And the defendant got on national television and said it wasn't that bad of a thing. The problem with it wasn't that there were two people dead, but that his law license might be denied.

The government's emphasis here, as it had been throughout the trial, was on Hale's reaction to the shootings after they occurred, not on any alleged involvement before the fact. Moreover, the remark is an isolated comment in the context of a trial during which the government otherwise obeyed the court's admonition not to suggest that Hale was behind the Smith shootings. The evidence against Hale was considerable, and the prosecutor's comment was not of the sort that improperly called attention to his exercise of a particular right. Mindful of the exacting plain error standard, we cannot say Hale has met his burden of establishing that the outcome of his trial would have been different but for the prosecutor's remark.

## C.  Sentence

Finally, Hale challenges his overall 480-month sentence on several grounds. We may quickly dispose of his argu-

ment regarding the application of U.S.S.G § 3A1.4, the terrorism adjustment. Relying on *United States v. Arnaout,* 282 F. Supp. 2d 838 (N.D. Ill. 2003), Hale argues that § 3A1.4 cannot apply because he was not convicted of a "federal crime of terrorism." Our decision on appeal in that case forecloses his argument. We held that § 3A1.4 applies "where a defendant is convicted of a federal crime of terrorism as defined by [18 U.S.C.] § 2332b(g)(5)(B) *or where* the district court finds that the purpose or intent of the defendant's substantive offense of conviction or relevant conduct was to promote a federal crime of terrorism as defined by § 2332b(g)(5)(B)." *United States v. Arnaout*, 431 F.3d 994, 1001 (7th Cir. 2005) (emphasis added); *accord United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004); *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001). That Hale did not commit a federal crime of terrorism is irrelevant; the district court found that the purpose of his soliciting Evola was *to promote* a federal crime of terrorism—the murder of a federal officer or employee.[1] Hale does not argue that the court's factual

---

[1] Under 18 U.S.C. § 2332b(g)(5)(B), a "federal crime of terrorism" is defined as a listed offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. The enumerated crimes include 18 U.S.C. § 1114, the murder or attempted murder of officers and employees of the United States. The definition of "federal crime of terrorism" appears within a statutory section entitled "Acts of terrorism transcending national boundaries," *see* § 2332b, and some of the cases cited above involve international terrorism, but the 1996 and 1997 amendments to the sentencing guidelines removed any requirement that *international* terrorism be implicated by the offense of conviction; the guidelines simply borrow the statutory definition from § 2332b(g)(5)(B). *See Graham,* 275 F.3d at 497-98 (enhancement applied to member of

(continued...)

finding is clearly erroneous, so the adjustment applies.

Hale also makes the frivolous argument that the remedial opinion in *Booker* retroactively increased his sentence, depriving him of due process. We held in *United States v. Jamison*, 416 F.3d 538, 539 (7th Cir. 2005), that there is no *ex post facto* claim to be made based on the remedial holding in *Booker*. Equally frivolous is Hale's argument that his sentence was increased based upon facts not charged in the indictment or proven to a jury beyond a reasonable doubt in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Hale was sentenced after *Booker,* and the district court treated the guidelines as advisory; no constitutional violation resulted from the application of upward adjustments based on facts found by the district court by a preponderance of the evidence. *See United States v. Belk*, 435 F.3d 817, 819 (7th Cir. 2006) ("[J]udges may continue to make findings based on a preponderance of the evidence, provided that they do not treat the Sentencing Guidelines as 'laws' with binding effect.").

Finally, Hale argues that his overall sentence is unreasonable. We have rejected Hale's sole challenge to the calculation of the guidelines range—the application of § 3A1.4—and will accept the range as properly calculated and therefore presumptively reasonable. *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). Hale can rebut the presumption by establishing that the sentence is unreasonable when measured against the factors set forth in 18 U.S.C. § 3553(a). *See id.* He points to two factors:

---

[1] (...continued)
domestic militia involved in plot to forcibly overthrow the government); *United States v. Nichols*, 169 F.3d 1255, 1270 n.5 (10th Cir. 1999) (explaining that § 3A1.4 would apply to Terry Nichols, convicted for his role in the bombing of the Alfred P. Murrah building in Oklahoma City, but for *ex post facto* considerations).

"the nature and circumstances" of the offense and "the history and characteristics of the defendant." The first argument is flimsy; Hale asserts that the government's role in the offense—"two years of attempts by the FBI to steer [him] away from obeying the law"—renders his sentence unreasonable. The argument suggests "sentencing entrapment," which occurs when an individual predisposed to commit a lesser crime commits a more serious offense as a result of "unrelenting government persistence." *See United States v. Gutierrez-Herrera*, 293 F.3d 373, 377 (7th Cir. 2002); *United States v. Estrada*, 256 F.3d 466, 473-74 (7th Cir. 2001). The government overcomes an alleged entrapment defense by establishing that the defendant was predisposed to commit the offense charged. This is not a great hurdle; "all that must be shown to establish predisposition and thus defeat the defense of entrapment is willingness to violate the law without extraordinary inducements." *Estrada*, 256 F.3d at 475. Hale asserts that he would not have solicited Judge Lefkow's murder if not for the government's involvement, but he has not established that the government, through Tony Evola, used "extraordinary inducements" to elicit criminal activity. As we have stated, the best way to manifest one's unwillingness to participate in criminal activity, and avoid the attendant penalties, is to "say no and walk away." *United States v. Wilson*, 129 F.3d 949, 951 (7th Cir. 1997).

As for Hale's "history and characteristics," he asserts that he is entitled to a lower sentence because he lacks a prior criminal record, he is a law school graduate, and his father is a retired police officer. The district court was aware of these facts, considered them, and explained at length why Hale merited the overall sentence imposed. Hale was entitled to no more. *See United States v. Williams*, 436 F.3d 767, 769 (7th Cir. 2006); *United States v. Laufle*, 433 F.3d 981, 987-88 (7th Cir. 2006); *United States v. Cunningham*, 429 F.3d 673, 675-76 (7th Cir. 2005).

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*