NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 13, 2007
Decided July 2, 2007

**Before**

Hon. JOHN L. COFFEY, *Circuit Judge*

Hon. JOEL M. FLAUM, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 06-3112

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *Plaintiff-Appellee,* | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 3:05-CR-30011-001-MJR |
| KELVIN ELLIS, <br> *Defendant-Appellant.* | Michael L. Reagan, <br> *Judge.* |

**O R D E R**

While serving as the Director of Regulatory Affairs for the City of East St. Louis, Illinois, Kelvin Ellis became involved in a pattern of corruption that led to separate indictments for election fraud, attempted tax evasion, and, as relevant to this appeal, obstruction of justice. A jury found him guilty of election fraud, and he pleaded guilty to attempted tax evasion; his two appeals in those cases are pending. *See United States v. Ellis*, Nos. 06-1555 & 05-4677 (7th Cir. arg. Feb. 21, 2007). In this third appeal, Ellis challenges the overall sentence he received after pleading guilty to three counts of obstruction of justice. *See* 18 U.S.C. §§ 1512(c)(2), 1503. Specifically, he argues that the district court erroneously applied an eight-level upward adjustment after concluding that his offenses involved "threatening to cause physical injury to a person." *See* U.S.S.G. § 2J1.2(b)(1)(A). Because the record supports the court's application of the adjustment, we affirm.

In the fall of 2004, federal law enforcement officials were conducting a grand jury investigation into allegations that Ellis had engaged in election fraud. As part of the investigation, they interviewed a confidential informant who told them that she was with Ellis when he paid numerous people, including her, to vote for certain candidates in a primary election. Ellis learned about the informant's cooperation on October 5, 2004, and the next day he told Deputy Police Chief Rudy McIntosh that he wanted "to destroy her credibility." Ellis said that they had to "do what we can to take her ass off the street."

Unbeknownst to Ellis, McIntosh was participating in the investigation and he tape-recorded their October 6 conversation. Over the next six weeks, he taped six more, revealing Ellis's evolving plan for dealing with the informant. On October 7, for example, Ellis promised to provide the informant's address and license plate number, and when McIntosh asked what Ellis wanted to do, he replied: "Far as you can take it. I want this bitch locked up." On November 19, they had the following exchange:

McIntosh:    So what you and I talked about with her before—

Ellis:    Mm hm.

McIntosh:    —that might twist this whole thing.

Ellis:    Oh, tie it up.

McIntosh:    Straight.

Ellis:    Dead, dead as a motherfucker. Okay.

. . . .

McIntosh:    To, to, to derail her, do you want me to go through with adding—

Ellis:    Man, I want her ass taken out.

McIntosh:    We can, we can, we can talk in front of Danita about it—[unintelligible].

Ellis:    Okay.

McIntosh: Do you want me to go to her and, and plant that crack on her?

Ellis: Shit.

McIntosh: Yes or no?

Ellis: I want her ass taken out. And I'll tell you what I tol' you before—however we hafta to do it.

Three days later, McIntosh again tried to discern Ellis's intent:

McIntosh: Well, here's the deal. If we put the crack on her, that's a 10-year thing. But do you want that done, or do you want her out of the picture, because—

Ellis: I don't—I ain't concerned with how. I ain't concerned with what. I'm concerned that this problem go away. You understand what I'm saying?

. . . .

McIntosh: All right. Here it is. We can dispose of her. I mean, dispose of her. I ain't talking about with the crack. I mean, if that's what you want done—I mean, if this don't make the problem go away.

Ellis: All we got to do is discredit her, dispose of her. She needs to be [inaudible].

. . . .

McIntosh: Well, between me, you, and the wall, she going to come up missing, and it ain't going to be on your hands or on my hands. But you know, I got your word that you going to make me mayor. I'm going to hold you to that one.

Ellis: I'm going to do everything that I can.

The next day, McIntosh told Ellis: "Make sure you're with your girlfriend, wife or somebody. 'Cause she's . . . gonna get knocked tonight." Ellis responded, "Done deal." The next day, during their final taped conversation, McIntosh showed Ellis a picture of the informant in which she appeared to be dead; federal agents had staged a fake murder scene. The two men had the following exchange:

McIntosh: Here's the deal, I've been up all fucking night, they tracked her to an apartment in St. Louis off 70. Done deal, you ain't, listen, listen to me, you ain't got to worry about, if she was the problem, she's dead, if she was the problem, problem gone. Now if she could testify, she going to testify from the bottom of Horseshoe Lake [near East St. Louis].

Ellis: My man.

. . . .

McIntosh: Alright, I'm going to roll out of here, you can keep that one, nah, you keep that one, and, and, if that was the problem, problem over.

Ellis: Our problem over.

Based on these events Ellis pleaded guilty to one count of obstructing justice by attempting to discredit or kill a government witness. *See* 18 U.S.C. § 1512(c)(2). And because he urged grand jury witnesses to invoke the Fifth Amendment privilege against self-incrimination, he also pleaded guilty to two counts of corruptly endeavoring to influence a witness in a grand jury proceeding. *See id.* § 1503. At sentencing the government recommended that the district court apply an eight-level upward adjustment on the premise that the first count involved "threatening to cause physical injury to a person." *See* U.S.S.G. § 2J1.2(b)(1)(A). Ellis objected, arguing that he intended for McIntosh to destroy the informant's credibility, not to physically harm her. The court, however, found that Ellis's recorded statements, in particular his reaction to the staged-murder photo, "'screams' defendant's intent to do away with a potential witness against him." The court thus applied the eight-level upward adjustment, and sentenced Ellis to 121 months' imprisonment.

On appeal Ellis argues that the district court misinterpreted his recorded statements and thus misapplied § 2J1.2(b)(1)(A). He argues that his statements, viewed in context, show only that he wanted to discredit the informant, and that any suggestion of harming her "came only from the Government's agents." Whether an obstruction-of-justice count involved a threat of physical injury is a factual question that this court reviews for clear error only. *See United States v. Sidhu*, 130 F.3d 644, 652 (5th Cir. 1997); *see also United States v. Schnurstein*, 977 F.2d 449, 455 (8th Cir. 1992) (whether defendant caused physical injury in connection with obstruction of justice "is a factual finding subject to the clearly erroneous standard of review").

The record amply supports the district court's finding that Ellis intended to silence the informant not only by fabricating a criminal case to destroy her credibility, but by having her killed. And contrary to Ellis's assertions, the recorded statements reveal that in several instances it was Ellis, not the government agent, who insisted that the informant should be physically harmed. For example, Ellis used the phrase "dead, dead as a motherfucker" to describe how he wanted McIntosh to handle the informant. And when McIntosh later asked for a "yes or no" answer to whether Ellis wanted him to plant crack on her, Ellis suggested escalating things, answering, "I want her ass taken out . . . however we hafta do it." Moreover, Ellis agreed to procure an alibi for himself when McIntosh said that the informant was "gonna get knocked tonight," and as the district court found, his response to the staged photograph can easily be described as relief. Ellis's statements reveal several circumstances strongly corroborating his intent to solicit murder. *See United States v. Hale*, 448 F.3d 971, 983 (7th Cir. 2005). Specifically, Ellis provided the informant's home address and license plate number, prepared for the offense by setting up an alibi, and "said nothing to suggest that a misunderstanding had occurred" when McIntosh showed him the staged photograph. *See id.* at 983-84. And even if reasonable minds could disagree over the meaning of Ellis's statements, such disagreement would not establish clear error. *See United States v. Miller*, 159 F.3d 1106, 1111 (7th Cir. 1998).

Ultimately, the district court's conclusion that Ellis planned to have the informant killed rested on a credibility determination. Ellis testified extensively at the sentencing hearing and attempted to provide innocent explanations for his remarks. But the court found his testimony "coy and evasive," and stated that "[a]t times he would torture the meaning of a word or phrase in order to temper it into an innocent construction." A district court's credibility determinations "can virtually never be clear error," *e.g., United States v. Ortiz*, 431 F.3d 1035, 1039 (7th Cir. 2005), and Ellis has pointed to nothing in the record to cast doubt on the court's credibility determination here, let alone to show that it was clearly erroneous.

Ellis also argues that "the enhancement based upon this alleged uncharged conduct so outweighs the original sentence for the charged conduct that the enhancement is clearly erroneous." This argument is meritless. First, the conduct supporting the upward adjustment was charged, and Ellis pleaded guilty to obstructing justice "by attempting to discredit or kill a government witness." Second, because the § 2J1.2(b)(1)(A) adjustment represents only eight levels out of the total offense level of 27, this is not a case where "the sentencing hearing becomes 'a tail which wags the dog of the substantive offense.'" *See United States v. Morrison*, 207 F.3d 962, 968 (7th Cir. 2000) (quoting *United States v. Corbin*, 998 F.2d 1377, 1387 (7th Cir. 1993)).

AFFIRMED.