In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1057

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHNNY W. LANE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07 CR 40103—**Michael M. Mihm,** *Judge.*

ARGUED NOVEMBER 9, 2009—DECIDED JANUARY 12, 2010

Before EVANS and SYKES, *Circuit Judges*, and
DER-YEGHIAYAN, *District Judge.**

EVANS, *Circuit Judge.* Johnny Lane was indicted on
drug charges along with three codefendants, Shawn
Barnes, Kim Lane (Kim is Johnny's half-brother), and
Raymond Harper. The codefendants pled guilty, but

* The Honorable Samuel Der-Yeghiayan, United States District
Judge for the Northern District of Illinois, sitting by designation.

Lane put his fate in the hands of a jury. After a two-day trial, he was convicted of conspiracy to distribute crack cocaine and possession with intent to distribute crack cocaine. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and 18 U.S.C. § 2. The jury also returned a special verdict on drug weight, and the district court imposed a mandatory life sentence based on Lane's prior felony drug convictions. Lane appeals both his convictions and the sentence he received.

In early 2005, Lane moved from Chicago to Rock Island (Illinois) to sell crack cocaine with his codefendants.[1] Barnes and Kim drove to Chicago at least every other weekend to buy drugs. Upon returning to Rock Island, the cocaine was broken down, weighed, cooked into crack, and then divvied up among the dealers. Lane sold crack almost every weekday and shared customers with Barnes and Harper. He pooled money with his codefendants for the "re-up" in Chicago at least five

---

[1] Rock Island is one of the Quad Cities, a region that straddles the Mississippi River, including several cities in Iowa and Illinois. Along with Davenport (Iowa) and Moline (Illinois), Rock Island was one of the original "Tri-Cities," as the area was known before World War I. In the 1930s, East Moline (Illinois) rose in population, which led to the name Quad Cities. The growth of a fifth city, Bettendorf (Iowa), inspired a brief campaign in the 1950s to rename it the Quint Cities. But it was too late. The Quad Cities name had stuck. http://en.wikipedia.org/wiki/Quad_Cities (last visited November 24, 2009).

times before his arrest in September 2007.[2] Between a half and a full kilogram of cocaine was obtained on each of those five trips.[3] Lane also occasionally traveled to Chicago with Barnes and Kim, though he did not participate in the drug buys. On one such trip, a kilogram of cocaine was purchased.

In 2006, Lane started living with Mia Kelly, who sold crack for Lane during his trips to Chicago. They moved to a new place in June 2007, and Barnes lived there, too. Prior to a police search of Kelly's house, Barnes asked Lane whether he needed any drugs from Chicago. Lane said no as he still had a "half eighth" left, meaning one-half of an eighth of a kilogram or 63 grams. Barnes bought about 100 grams of crack for his own supply and stored

---

[2] Admittedly, the Merriam-Webster Online Dictionary (2009) defines re-up as "to sign on again" or "to enlist again." http://www.merriam-webster.com/dictionary/Re-up (last visited December 2, 2009). But in drug slang "re-up" is used as a verb, meaning to replenish a drug supply, or as a noun, referring to the act of replenishing. *See*, *e.g.*, *The Wire*. "Those of you on the west side who need to re-up, holler at my man Monk. He gonna handle supply over there. On the east side, Cheese. One more thing, price of the brick goin' up. 30 more." Marlo Stanfield, Season 5, Episode 56, "The Dickensian Aspect." (HBO original air date February 10, 2008).

[3] Whether the defendants purchased between a half kilogram and a kilogram on each of the five trips or in total is unclear as the prosecutor asked "Do you recall what total amount of drugs you purchased on those occasions?" Barnes replied, "Anywhere from a half key to a key."

it in the basement of Kelly's house. When Rock Island police executed a search warrant at Kelly's house in mid-September, they found three adults and three children inside. They observed Barnes asleep in the living room on an air mattress, Lane near the northeast bedroom, and Kelly in the second bedroom, which appeared to be the children's. Officers found 3 grams of crack cocaine underneath the air mattress as well as Barnes's drugs in the basement. In the northeast bedroom, they found Lane's identification in a wallet on the dresser, men's clothing fitting Lane's build, and 53.6 grams of crack cocaine hidden in a pair of socks in a clothes hamper in the closet. The crack was in 22 individually wrapped packages.

On the first day of trial, one of the police officers, Ed Connelly, testified to what he found during the search and about the interview he conducted with Lane following Lane's arrest. When asked about the nature of the interview, Connelly said in part, "When I advised him that we had found roughly 4 ounces of crack cocaine in the house, he stated that he needed a lawyer." Lane did not object, but the district court immediately gave a curative instruction that the jury should not hold Lane's statement about wanting a lawyer against him. Lane then asked for a mistrial, but the judge denied the request.

Later that day, Barnes took the stand. He testified about Lane's drug dealing activities, but he also dropped two stink bombs into the trial. When the government asked Barnes whether Lane sold crack in Chicago before moving to Rock Island, he commented that Lane had

been "in and out of jail." Shortly thereafter, the prosecutor asked Barnes if Lane was in Chicago prior to moving to Rock Island. Barnes said Lane was in Chicago but incarcerated on a parole violation. After this second reference to his criminal history, Lane objected, but he declined the judge's offer to give the jury a cautionary instruction.

The jury returned a guilty verdict on both counts as well as a special verdict finding that Lane knew or could have reasonably foreseen that the conspirators distributed 50 or more grams of crack cocaine in furtherance of the conspiracy and that Lane possessed with intent to distribute at least 50 grams of crack. Prior to trial, the government had submitted an information pursuant to 21 U.S.C. § 851 to give Lane notice that if he were found guilty he would face an enhanced sentence of life imprisonment due to his prior felony drug convictions. The information listed three convictions; the government mislabeled the first offense a felony when it was actually a misdemeanor and incorrectly identified Lane's two veritable felony offenses. However, Lane made no objection to these errors. After Lane's conviction, the district court sentenced him to concurrent, mandatory life sentences on both counts.

On appeal, Lane challenges his conviction on three grounds, arguing that: the district court improperly allowed Officer Connelly to testify that the northeast bedroom in Kelly's house belonged to Lane and Kelly; the evidence on count two was insufficient to prove the crack cocaine found in that bedroom was his; and testimony

about Lane's postarrest request for an attorney and his prior incarceration required a mistrial. Lane also appeals his sentence on two grounds, claiming that: the district court improperly imposed a sentence enhancement based on the § 851 information that mislabeled Lane's prior felony drug convictions; and the district court miscalculated the applicable drug weight and consequent guidelines offense level based on inconsistent statements from Lane's codefendants.

Yes, there were problems at trial and with the § 851 information. But having said that, we think none warrant a do-over of the trial. We take up each of the issues in turn.

Lane argues that it was error for the trial court to admit Connelly's testimony about who lived in the northeast bedroom. Because Lane failed to object at trial, we review the issue only for plain error. And that error must be a clear one, affecting Lane's substantial rights. We only notice the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993). That is one tough standard to meet on appeal. In this case, our review is simple as there was no error. It was appropriate to have Connelly draw a lay conclusion about who lived in which bedroom.[4] Lane argues that Connelly had "*no* first hand

---

[4] Federal Rule of Evidence 701 states that "[i]f the witness is not testifying as an expert, the witness' testimony in the form

(continued...)

knowledge," but that is simply not true. Connelly had firsthand knowledge of what he observed at Kelly's house during the search. He saw Lane standing near the northeast bedroom, where Connelly found a wallet with Lane's identification on the dresser and clothes that fit Lane's build. Connelly also observed bunk beds for the children in the second bedroom and Barnes sleeping on the air mattress in the living room. Thus, it was a reasonable inference that Lane and Kelly occupied the northeast bedroom. At oral argument, Lane insisted that the prosecution should have introduced the physical items into evidence: the wallet, ID, and clothes. But he is grasping at straws. No rule requires the government—or the defense—to present physical evidence anytime a lay witness testifies about something he saw.

Next, Lane argues there was insufficient evidence to find him guilty of count two, the possession charge. To succeed on this claim, Lane must show there was no evidence that could support the jury's finding of guilt beyond a reasonable doubt. *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008). To prove guilt under 21 U.S.C. § 841(a)(1), the government had to show that Lane (1) knowingly or intentionally possessed

---

[4] (...continued)

of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

[crack] cocaine (2) with the intent to distribute it (3) while knowing it was a controlled substance. *United States v. Starks*, 309 F.3d 1017, 1022 (7th Cir. 2002). Lane argues that the government failed to show any evidence that he possessed the cocaine. But the police were not required to catch Lane with his hand in the cookie jar. *See id.* ("A defendant need not be caught red-handed in order to satisfy the possession element"). The government only needed to prove constructive possession, which can be established through circumstantial evidence and exists where the evidence demonstrates ownership, dominion, authority, or control. *United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000). Viewing the evidence in the light most favorable to the verdict, there were numerous pieces of evidence tying the crack in the bedroom to Lane, including Connelly's observations which we just discussed. Furthermore, witnesses testified that Lane possessed crack daily and that he kept drugs at Kelly's house. Just prior to the search, Lane turned down an offer to buy more drugs as he still had a "half eighth," which is about the same amount of crack that was found in the hamper. Plus, the other dealer in the house, Barnes, kept his crack separately in the basement. Thus, there was more than enough evidence for the jury to find Lane guilty of possession with intent to distribute.

Third, Lane asserts that references to his postarrest request for an attorney and his prior incarceration required a mistrial. We review a district court's decision on motions requesting a mistrial for an abuse of discretion. *United States v. Taylor*, 569 F.3d 742, 746 (7th Cir.

2009). The trial judge "is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial." *United States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000) (citing *United States v. Mealy*, 851 F.2d 890, 902 (7th Cir. 1988)). Connelly had been on the Rock Island police force for seven years when he testified that Lane stated he wanted a lawyer—clearly, a veteran police officer should have known that his answer to the prosecutor's question went too far. Introducing evidence of a defendant's request for an attorney undermines the exercise of a constitutional right. However, an improper answer does not necessarily violate due process. *See Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991). Here, the prosecutor did not seek the testimony, nor use it against Lane. Plus, a curative instruction was given, and "[e]rrors that are the subject of corrective instructions to the jury are presumed harmless." *United States v. Wantuch*, 525 F.3d 505, 516 (7th Cir. 2008). In the context of the trial as a whole, it was well within the experienced district judge's discretion to deny the motion for a mistrial. With respect to Barnes's testimony that Lane was "in and out of jail" and "incarcerated on a parole violation," Lane objected but did not move to strike the testimony or ask for a mistrial. When the district court offered to give a curative instruction, Lane declined. It was improper for Barnes to mention Lane's criminal history, but the district judge exercised proper discretion in not sua sponte declaring a mistrial.

Turning to sentencing, Lane argues that the § 851 information filed by the government was inadequate because

it mislabeled a misdemeanor as a felony and incorrectly identified his felony convictions. Again, we review for plain error because Lane did not object during the district court proceedings. The two main purposes of the § 851 information are to give the defendant an opportunity to contest the accuracy of the prior convictions and to inform his decision on whether to plead guilty or proceed to trial. *United States v. Williams*, 584 F.3d 714, 715 (7th Cir. 2009). The government correctly identified the dates, jurisdiction, and classification of two of them as felonies, which put Lane on notice that he faced a mandatory life sentence. He easily could have asked for clarification on the labels upon receiving the information. Instead, Lane waited until his appeal to raise this objection, and in doing so, he fails to show any prejudice. This was a case of careless mislabeling that ultimately proved harmless.

Lastly, Lane argues that the district court miscalculated the applicable drug weight and subsequent guidelines offense level based on unreliable statements from Lane's codefendants. However, the district court stated at sentencing that it found the witnesses credible and believed the government met its burden by a preponderance of the evidence that Lane was accountable for at least 4.5 kilograms. Moreover, Lane's argument is irrelevant as the district court did not use the guidelines to arrive at the life sentence. Instead, 21 U.S.C. § 841(b) required the district court to impose a term of life imprisonment given Lane's two prior convictions for felony drug offenses and the jury's special verdict, which held Lane responsible for at least 50 grams of crack cocaine.

For all these reasons, we AFFIRM the judgment of the district court.