In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3524

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JAMELLE CARRAWAY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 2:08-cr-20010-MPM-DGB-1—**Michael P. McCuskey**, *Chief Judge.*

ARGUED FEBRUARY 26, 2010—DECIDED JULY 20, 2010

Before FLAUM and WOOD, *Circuit Judges*, and ST. EVE, *District Judge.**

WOOD, *Circuit Judge.* Jamelle Carraway made the mistake of mixing up his involvement in the cocaine business in Central Illinois with romance. Eventually he was caught, thanks to good police work, and his para-

* Hon. Amy J. St. Eve, District Judge for the Northern District of Illinois, is sitting by designation.

mour, Lisa Owens, who decided to take a deal from the prosecutor and testify against him. After a bench trial, the court found him guilty of possessing with intent to distribute more than 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). Because he had three prior drug felony convictions, he received a mandatory sentence of life imprisonment. On appeal, Carraway insists that the trial court should not have believed Owens's testimony and that his life sentence was unconstitutional. Neither of these arguments has merit, and so we affirm.

# I

Our story begins with a series of conversations between Lisa Owens and her incarcerated husband, Maurice Owens. (For simplicity, we refer to Lisa Owens as "Owens" and Maurice Owens, where necessary, as "Maurice.") On several occasions, Maurice asked Owens to assist a man called "Big O" and his associates with their plans to engage in crack dealing in the Decatur, Illinois, area after Big O's imminent release from prison. Big O is the brother of defendant Carraway. Owens initially refused her husband's entreaties, but eventually agreed to assist him. She did so, according to her testimony at Carraway's trial, only when Maurice suggested that if she was not amenable to the arrangement then he would turn for help to his former love interest (and the mother of some of his children). Owens purported to be concerned about that arrangement because the other woman had a history of drug problems.

Whatever her motivation, in the summer of 2007 Owens met Big O, who introduced her to Carraway and others. Owens learned that Carraway obtained drugs in Chicago and brought them to Decatur for distribution. Later that summer, Owens and Carraway began a romantic relationship. Carraway moved in with Owens, left clothes at her home, and had his own set of keys to her apartment.

As a result of their relationship, Owens had the opportunity to observe Carraway's role in the drug operation. Owens testified that she had seen Carraway unpack, weigh, and bag crack that he had obtained in Chicago in preparation for selling it in Decatur. Owens testified that she routinely saw Carraway with drugs or large amounts of cash. Occasionally, Carraway asked Owens to weigh, package, and deliver the crack for him, and she obliged him. Although Owens collected money for these sales, she said that she did not keep it; she testified that her practice was to give the cash to Carraway or slip it into his underwear drawer at their shared abode.

In January 2008, Owens and Carraway moved to a house on Franklin Street. The lease and utility bills were in Owens's name, and Owens paid the rent. As she tells it, Owens understood that Carraway retired from the crack-dealing business shortly after they moved into the new home. But she was evidently mistaken. After police officers set up a controlled buy with Carraway, they obtained a search warrant for Owens's house, which they executed on January 29, 2008. There they found more than 130 grams of crack cocaine: 2.3 grams of moist crack in Carraway's pocket; 24.3 grams of moist crack in

small bags inside a larger paper bag on the kitchen counter; and at least 107 grams of moist crack in other bags in a kitchen cabinet. The officers also found a digital scale in a drawer near the paper bag. In the bedroom, the officers located $9,116 in cash tucked in a box in a dresser drawer containing men's boxer shorts. The officers found Carraway and Owens in the home, and found keys to the home in Carraway's pocket.

Carraway and Owens were both charged with federal crimes: Owens was charged with one count of possession with intent to distribute crack cocaine, 21 U.S.C. § 841(a)(1) & (b)(1), and one count of managing and making a house available for the purpose of storing and distributing crack cocaine, 21 U.S.C. § 856(a)(2); Carraway was charged with possession of crack with the intent to distribute, 21 U.S.C. § 841(a)(1) & (b)(1). Owens, however, struck a deal under which she agreed to plead guilty to maintaining a drug-involved house, and the government agreed to dismiss the possession charge. Owens also promised to cooperate with the government in its case against Carraway. True to her word, when Carraway went to trial, Owens testified for the government, along with three officers involved in the case. Carraway presented no witnesses. On June 1, 2009, the district court found Carraway guilty of possession with the intent to distribute more than 50 grams of crack cocaine. It specifically found that Owens's testimony was credible, and that her testimony combined with the physical evidence was sufficient to establish beyond a reasonable doubt that Carraway knowingly possessed the crack, knew it was a controlled substance, and

intended to distribute it. Because of Carraway's prior convictions, the district court was required to sentence Carraway to life in prison. 21 U.S.C. § 841(b)(1)(A). The court entered the life sentence on October 6, 2009. Carraway appeals.

**II**

Carraway attacks both his conviction and his sentence on appeal. He insists that Owens was not a credible witness, and that without her testimony, the government failed to provide sufficient evidence to support the conviction. Recognizing that the life sentence that the court imposed was required by statute, he argues only that the mandatory life sentencing provisions of § 841(a)(1) and (b)(1)(A) are unconstitutional. In addressing these points, we group together his attack on Owens's credibility and the sufficiency of the evidence, and then turn to the sentencing argument.

**A**

We start with Carraway's effort to overturn his conviction. A challenge to the sufficiency of the evidence for conviction is reviewed "in the light most favorable to the government," *United States v. Albarran*, 233 F.3d 972, 975 (7th Cir. 2000); we uphold a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Section 841(a)(1), the offense of conviction here, applies if the defendant knowingly or intentionally possessed a controlled substance with the intent to distribute it, while knowing that it was a controlled substance. *United States v. Lane*, 591 F.3d 921, 926 (7th Cir. 2010). Carraway argues that the government failed to establish that he possessed the crack that was not found on his person. (Carraway effectively concedes that he knew that the crack was a controlled substance and that, if he is found to have possessed the large quantity of crack recovered from the house, the evidence was sufficient to establish that he intended to distribute it.) The government must establish the possession element beyond a reasonable doubt; constructive possession is sufficient; and the government may use circumstantial evidence to establish constructive possession. *United States v. Campbell*, 534 F.3d 599, 605-06 (7th Cir. 2008). It is not enough for the government to show only that Carraway was in the same house as the crack. *Id.* at 606.

As if the bar for sufficiency-of-evidence challenges were not high enough, Carraway's argument takes a particularly difficult route by effectively conceding that he cannot win unless we were to find that Owens, the primary witness linking him to the crack, was not credible. Credibility determinations are best handled by the trier of fact, not the appellate court, see, *e.g., United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008), and the district court expressly found that Owens's testimony was credible. We will "overturn a conviction based on a credibility determination only if the witness' testimony was incredible as a matter of law." *United States v. Hayes*,

236 F.3d 891, 896 (7th Cir. 2001). See *United States v. Kizeart*, 505 F.3d 672, 675 (7th Cir. 2007) (referring to the "ultra-narrow review" of the trier of fact's credibility determinations based on the witness's demeanor).

Carraway forges ahead anyway, beginning with a plea for this court to focus on Owens's criminal history. He believes that her conviction for welfare fraud demonstrates a willingness to lie, and that her admission that she would do it again bolsters this conclusion. These facts, however, as well as their context, were brought out at trial. Owens explained that she was homeless when she committed the fraud and did so only to provide for her children. Not that this is enough to condone fraudulent behavior, of course, but it suggests why she indicated that she might commit fraud again if the circumstances were similar, and why the district court might have decided to believe her other testimony despite this history. Carraway also points to Owens's prior conviction for possession of crack cocaine with the intent to distribute in 1996. But a single earlier conviction does not render incredible all future statements; many credible witnesses in criminal cases would fail such a draconian test.

Carraway has also pointed to more particular reasons to distrust what Owens had to say in his case. He mentions as especially unpersuasive her assertion that her motives for participating in the drug operation were pure: first to protect her husband's former partner, and later to hasten Carraway's exit from the drug business. Carraway suggests that there is evidence that Owens was

in fact the individual who possessed and intended to distribute the crack cocaine. The crack house was in Owens's name, she paid the rent, and she participated in drug deals and took cash from those sales. He also stresses that Owens moved to this new, larger home without any evidence of an increase in licit income. It is Carraway's view that Owens's testimony was designed to deflect responsibility from herself.

Once again, even if the evidence would support the conclusions that Carraway has drawn, this is not enough to overcome the district court's finding that Owens's testimony taken as a whole was credible. Indeed, we find many of her statements to be believable—for example, it would not be unusual for a person to do a favor for a spouse, even if that favor benefitted the spouse's ex. Moreover, none of this gives us much doubt about the parts of Owens's testimony that support the finding that Carraway constructively possessed the crack cocaine. As the government rightly notes, the physical evidence found by the officers corroborates many of the central details of Owens's testimony. Owens testified that Carraway lived at the Franklin Street house; the police found Carraway at the house with keys to it in his pocket. Owens testified that Carraway kept drugs and money at the home; the police found moist crack in Carraway's pocket, moist crack in the kitchen, and cash in the drawer containing men's underwear. Owens described Carraway's process for weighing and packaging the drugs, and testified that he undertook these tasks in the home; the officers found a digital scale, bags, and bagged drugs in the home consistent with these descriptions.

With Owens's credibility secure, we need ask only whether the evidence she provided, coupled with the fruits of the search and the other testimony at trial, is sufficient to establish the elements of the offense. It is. Owens's testimony and the associated physical evidence described above are sufficient to establish that Carraway knowingly possessed more than 50 grams of crack. This conclusion is bolstered by the fact that Carraway was arrested with moist crack in his pocket—the additional crack that the officers discovered in the kitchen also was still moist. The quantity of crack, its preparation, and the associated articles are sufficient to establish that Carraway intended to distribute it. And Carraway knew that the crack was a controlled substance. There was ample evidence here, in short, to support the conviction.

B

We can be brief with Carraway's sentencing arguments. He asks us to find that the imposition of a mandatory life sentence for dealing in crack violates the Fifth, Eighth, and Fourteenth Amendments to the Constitution and is inconsistent with the doctrine of separation of powers. (Although Carraway's brief refers to the Sixth Amendment, we think that he meant to invoke the Eighth Amendment's protection against cruel and unusual punishment.) As he did not raise these issues before the district court, our review is for plain error. *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009); *United States v. Olano*, 507 U.S. 725, 731-37 (1993).

Carraway concedes that this court and other courts have ruled against him on virtually every one of these points. See, *e.g., United States v. Strahan*, 565 F.3d 1047, 1052-53 (7th Cir. 2009) (rejecting Eighth Amendment challenge to mandatory-minimum life sentence under § 841(b)); *United States v. Collins*, 223 F.3d 502, 511 (7th Cir. 2000) (treating the mandatory life "three strikes" provision in § 841 as functionally indistinguishable from other statutes that have survived equal protection, double jeopardy, due process, and Eighth Amendment challenges); see also *United States v. Prior*, 107 F.3d 654, 658-60 (8th Cir. 1997) (rejecting equal protection, due process, Eighth Amendment, and separation-of-powers challenges to a life sentence under § 841(b)). We decline Carraway's invitation to revisit these holdings. Under settled law, the district court's decision to impose the life sentence was not error at all, much less plain error.

* * *

The judgment of the district court is AFFIRMED.