In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-4292

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANTHONY E. MOORE, also known as ARAB,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 4:06-CR-40063—**J. Phil Gilbert**, *Judge*.

ARGUED NOVEMBER 3, 2010—DECIDED APRIL 14, 2011

Before EASTERBROOK, *Chief Judge*, WILLIAMS, *Circuit Judge*, and PALLMEYER, *District Judge*.*

WILLIAMS, *Circuit Judge.* Anthony E. Moore was convicted of conspiring to distribute drugs and of being a

* The Honorable Rebecca R. Pallmeyer, United States District Court Judge for the Northern District of Illinois, sitting by designation.

felon in possession of a firearm. He now appeals his conviction, asserting that the district court made four reversible errors during his trial.

Moore first argues that the court should have ordered a mistrial based on a question by the prosecutor regarding a gang. However, the prosecutor's question did not implicate Moore as a gang member and did not deprive him of a fair trial. Moore's next argument is that the court erred procedurally and substantively in admitting evidence of Moore's drug transactions that occurred before the start of the charged conspiracy. We find that although the court should have explained its reasons for admission, the prior drug transaction evidence was admissible to prove an element of the charged crime and went towards Moore's intent and knowledge.

Next, Moore argues that the court should not have admitted evidence that alluded to an involvement in dog fighting. This evidence, however, also contained an admission by Moore and its probative value outweighed any danger of unfair prejudice. Moore also asserts that the court should have ordered a mistrial after a juror encountered an associate of Moore's during a lunch break and discussed the experience with her fellow jurors afterward. But the court's voir dire of the jury following the juror's incident was proper, the jury was not compromised, and the juror did not discuss the trial inappropriately. Finally, Moore argues that even if no single trial error merits reversal, the cumulative effect of the errors requires reversal. However, the cumulative error doctrine does not apply because we do not find

that Moore identified more than one error. Therefore, we affirm his conviction.[1]

## I. BACKGROUND

On May 8, 2008, after a four-day trial, a jury convicted Anthony Moore of conspiring to distribute 50 grams or more of cocaine base from October 2002 to March 7, 2007, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The jury found him not guilty of violating 18 U.S.C. § 924(c)(1)(A) and (B), possession of a short-barreled shotgun in furtherance of a drug-trafficking crime. Moore was sentenced to life imprisonment on the conspiracy charge and 120 months on the firearm charge, to run concurrently. Additional facts will be presented below where relevant.

## II. ANALYSIS

### A. Mistrial Motion Based on Prosecutor's Question Properly Denied

Moore argues that the prosecutor engaged in prosecutorial misconduct by asking a question regarding a gang,

---

[1] While this appeal was pending, the parties filed supplemental briefing to address the Fair Sentencing Act of 2010 and whether its enactment affects Moore, who was sentenced in 2008. Because we have since held that the Fair Sentencing Act is not retroactive, *see United States v. Bell*, 624 F.3d 803, 814 (7th Cir. 2010), the Act does not affect Moore's sentence.

and that the court erred by not ordering a mistrial as a result. This argument fails because the prosecutor's question did not constitute prosecutorial misconduct.

We review a district court's decision on motions requesting a mistrial for an abuse of discretion. *United States v. Lane*, 591 F.3d 921, 927 (7th Cir. 2010). In evaluating claims of prosecutorial misconduct, we employ a two-step process. We first look at the comment in isolation to determine if it was improper. *United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006). If we find that it was improper, we must then examine the comment in light of the record as a whole to determine whether the comment deprived the defendant of a fair trial. *Id.* The ultimate question is whether the comment "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*

Here, the government had witnesses who could testify that Moore bragged about being a high-ranking member of the Gangster Disciples street gang ("GDs"), and that he used his status to recruit them into buying drugs from and selling drugs with him. Moore's trial was held before a court that had a general policy of disallowing gang affiliation testimony. This policy acknowledges "the substantial risk of unfair prejudice attached to gang affiliation evidence", and our court's directive of "careful consideration by district courts in determining the admissibility of gang membership and gang activity evidence." *United States v. Irvin*, 87 F.3d 860, 864 (7th Cir. 1996). The prosecutor had significant experience appearing before the trial court, and was well aware of

its general policy of excluding evidence that could raise an inference of gang membership and activity.

During a pre-trial motion hearing, the prosecutor explained that he wanted to elicit testimony about Moore recruiting co-conspirators in his distribution of drugs, but that he would "limit it to the best of my ability". He stated that, "I will not say, 'Did the defendant say he was the governor of the Gangster Disciples?' I will stay away from all of that and not even ask." The court reiterated that Moore's gang affiliation was inadmissible, but that "depending upon what a witness says in response to a question either on direct or cross examination, the Court may instruct the jury regarding [the issue of gangs] if it comes in."

Devon Smith testified on the second day of trial. He was not one of the witnesses who could testify to being recruited by Moore. Instead, he was scheduled to testify about buying drugs from Moore, selling drugs with him, watching him sell drugs to other people, Moore's control over alleged crack houses, and Moore's possession of guns. During Smith's direct examination, the following exchange took place between the prosecutor and Smith:

> Q [Prosecutor]. Now, a few days before you got picked up on this case, did you have a conversation with the defendant on 18th Street?
>
> A [Smith]. Yes, I did.
>
> * * *

Q. And what was he talking about?

A. He talking about he tired of these BDs down there, and they were going to have to start paying dues.

Q. Okay. He was tired of GDs down here?

A. Yes.

Q. What are GDs?

A. That's another gang.

Q. Okay.

[Moore's Attorney]: Objection, Your Honor. May we approach?

THE COURT: No. The objection—

[Moore's Attorney]: We had had a discussion.

THE COURT: I realize that.

Q [Prosecutor]. Let me ask you this way: Was there another group of people?

A [Smith]. Yes, there was.

Q. And did you have a conversation with the defendant?

A. Yes.

Q. And without going into—did he talk about paying dues?

A. Yes, he did.

Q. What did he say about that?

A. He was talking about the GDs wanted to start paying.

Q. Without saying any organizations—

A. He said people going to pay dues. He wanted them to pay for the drugs that the other gang, the other group of people was bringing in. And then us, you know what I'm saying, the ones that was in town and everything, making us all start paying dues.

Q. He was wanting to make other people who were selling drugs to pay dues to him?

A. Yes.

At the next break in trial, and outside the presence of the jury, the following exchange took place between the court and the parties:

THE COURT: With respect to Devon Smith . . . you should not have asked the question. . . . What are DBs or BDs? What are BDs? That just, you know, you should not have asked that question. The Court's going to find that it's harmless in bringing up about the gang affiliation, but don't ask those types of questions. That invites the gang affiliation.

[Prosecutor]: I apologize, Your Honor. Because we weren't talking about the Gangster Disciples and he said BDs. I didn't know if the jury understood.

THE COURT: There are some things the jury shouldn't understand.

[Prosecutor]: I apologize. We aren't talking about an organization that Mr. Moore was in, but a different one in town. I apologize to the Court for doing that.

THE COURT: Stay away from that. The Court finds it's harmless.

[Moore's Attorney]: Now that we're outside the scope of the jury, I request a mistrial.

THE COURT: I figured you would, and I'm denying the motion.

Moore's claim of prosecutorial misconduct is based on the question, "What are GDs?". The district court did not abuse its discretion in refusing to declare a mistrial based on this question because, when viewed in isolation, the question was not improper. And, in any event, it did not deprive Moore of a fair trial.

As the prosecutor stated during his oral argument before our court, he should not have asked the question, "What are GDs?". It necessitated testimony regarding a gang, and any response to the question would not have aided the jury in assessing the case against Moore. However, though it was ill-advised, the question was not improper in isolation because it did not implicate Moore's alleged personal affiliation with the GDs, or with any gang. It is possible that Moore, as an individual, would want and demand "dues" from the "GDs" without having any gang affiliation himself. Even if the question called for testimony about a gang generally, it does not mean that the question

necessitated testimony regarding Moore's membership within or leadership of the GDs.[2]

Even if we had found that the question was improper in isolation, it would still not necessitate reversal because it did not deprive Moore of a fair trial. Indeed, any inference of an alleged gang affiliation played a minor role in Moore's trial. First, no witness directly testified to Moore's membership within, or leadership of, the GDs.[3] Second, witness testimony regarding gangs hardly appears in the record, perhaps because the prosecutor went to great lengths to avoid such testimony. For exam-

---

[2] It also seems that the court reporter may have misheard or misrecorded the prosecutor's question. Smith's recorded testimony referenced "BDs". Referring to the prosecutor's question, the court said, "you should not have asked the question. . . . What are BDs". In response the prosecutor said, "we weren't talking about the Gangster Disciples and he said BDs." If the prosecutor did indeed ask for clarification about what "BD" meant, it lends more support to our conclusion that the prosecutor was not seeking information about Moore's alleged association with or control over the GDs.

[3] One of the government witnesses testified that Moore said he would have "the GDs . . . kill" a witness in the case. But the question that elicited this response—"And did he say, did Anthony Moore say anything about Mr. Lott, about what he was going to do?"—was not improper because it did not compel testimony about gang membership. When the prosecutor asked a different government witness a similar question—"What did you hear the defendant say about Ronnie Lott?"—the witness replied, "He was going to have him killed", without mentioning the GDs.

ple, the prosecutor would preface questions with statements such as, "Without going into any organizations the defendant might have told you about. . .". And, at one point at a sidebar, the prosecutor advised the court that, "I may have to lead this witness a little bit so he doesn't mention GD." Later on in the sidebar, the court said, "Why don't you ask him what 7-4 means", even though the court had previously warned the parties not to explain "7-4", which is a moniker often given to GDs because G is the seventh letter of the alphabet and D is the fourth letter of the alphabet. The prosecutor replied, "I'm not going to . . . [the witness] might blurt out [that Moore] said he was the governor of the GDs running in Mt. Vernon. I need to lead him a little bit about guns and drugs so he doesn't blurt anything out."

Finally, during its pre-trial motion hearing, the court said that it would consider providing a cautionary jury instruction regarding gangs depending on witnesses' testimony on direct or cross-examination. Moore did not request a cautionary instruction after the prosecutor asked the question he now challenges. During the jury instruction conference which came directly before closing arguments, the court gave Moore and the prosecution its standard jury instructions, and let each side propose additional instructions. Moore did not argue for a cautionary jury instruction to address gang affiliation. Moore's failure to assert a need for a cautionary instruction directly following the incident, or at the close of evidence, in spite of the court's clear willingness to consider it, undermines his current argument that any comment or reference regarding gang affiliation

"so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hale*, 448 F.3d at 986.

The "[w]hat are GDs" question did not implicate Moore's alleged involvement with the organization. No witness testified directly to Moore's gang membership or leadership. Gang references are few and far between in the record. And Moore did not request a cautionary jury instruction regarding gangs, in spite of the court's express willingness to consider it. Because the question was not improper in isolation and it did not deprive Moore of a fair trial, the district court did not abuse its discretion in denying Moore's motion for a mistrial.

### B. Evidence of Prior Drug Transactions Was Admissible

The court allowed evidence of some of Moore's drug transactions that occurred before the indictment's charged conspiracy start date of October 2002. The court admitted the evidence under the exceptions to the exclusionary rule of Federal Rule of Evidence 404(b). Moore argues that the court erred procedurally by not explaining why it was admitting the evidence, and substantively because the evidence does not meet the rule's standard for admissibility. We find that while the court should have explained its rationale, it did not ultimately err in admitting the evidence.

Federal Rule of Evidence 404(b) prohibits evidence of other crimes, wrongs, or acts to prove that a person

has a propensity to commit the crime in question. How-ever, evidence otherwise excludable per this rule may be admissible for certain purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowl-edge, identity, or absence of mistake or accident". Fed. R. Evid. 404(b). We review a district court's decision to allow Rule 404(b) evidence for an abuse of discretion. *United States v. Holt*, 460 F.3d 934, 936 (7th Cir. 2006). Even if there is a mistake, we will not reverse if the error was harmless. *United States v. Bonty*, 383 F.3d 575, 579 (7th Cir. 2004). Therefore, we evaluate evidentiary chal-lenges like Moore's in light of all the evidence that was before the jury. *Holt*, 460 F.3d at 936.

The first set of evidence that Moore contends was improperly admitted involved drug transactions from June of 2000. Police Captain Ron Almaroad testified that he coordinated a controlled buy between Moore and an informant where Moore sold the informant crack cocaine for twenty dollars. A videotape of the controlled buy was admitted as evidence and played for the jury. Still photographs of the transaction were also admitted as evidence, as well as a sealed evidence bag con-taining the crack cocaine that exchanged hands. Captain Almaroad further testified that another controlled buy involving Moore and the same informant occurred the next day. Photographs of this second transaction, and a sealed evidence bag containing the crack cocaine that was sold, were also admitted as evidence. As a result of these two sales, Moore was convicted in November of 2000 for unlawful delivery of a controlled substance, which, under Illinois law, is a felony. The certified court

documents of this conviction were admitted into evidence. The second set of prior drug activity evidence was the testimony by Devon Smith. Smith testified that he had limited involvement with Moore in 2000 and 2001 and bought drugs from him in $20, $50, and, rarely, $100 increments. The court admitted the two sets of evidence over Moore's objection pursuant to Federal Rule of Evidence 404(b), but did not explain under what theory the rule applied. Instead, the court simply said that the evidence "would be 404(b), and the court's going to allow that with the cautionary 404(b) instruction." Indeed, before Captain Almaroad's testimony, the court instructed the jury that "the evidence you are about to hear is for a limited purpose. You can consider this testimony only on the person's knowledge, intent, and opportunity rather than the propensity for him to commit the crimes charged in this indictment. You should consider this evidence only for this limited purpose." The court also gave an instruction directly before Smith's testimony that was substantively identical. Finally, the court gave another Rule 404(b) limiting instruction at the close of evidence that was similar to the two previous instructions, but replaced the rule's "opportunity" exception with the "lack of mistake" exception.

The court should have explained its rationale in admitting the evidence pursuant to Rule 404(b) (just as the parties should have requested an explanation in the absence of one). In evaluating potential Rule 404(b) evidence, the court must both identify the exception that applies to the evidence and evaluate whether the probative value of the evidence outweighs its potential

prejudicial effect. *United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir. 1987). If the court does not explain its decision in admitting Rule 404(b) evidence, we have no way to determine whether this necessary balancing test occurred. This is especially problematic here, where the court gave slightly different Rule 404(b) limiting instructions because it replaced the "opportunity" exception with the "lack of mistake" exception during its delivery of the final instructions at the close of evidence.

There are important considerations underlying our past guidance that it is "prudent for district courts to give the basis for the admission of Rule 404(b) evidence at the time of the ruling." *United States v. Albiola*, 624 F.3d 431, 439 (7th Cir. 2010). *But see United States v. Ciesiolka*, 614 F.3d 347, 360 n.2 (7th Cir. 2010) (Ripple, J., dissenting) (arguing that a district court may explain its Rule 404(b) weighing after the evidence has been admitted). Explaining evidentiary decisions in a timely manner is important to the defendant, who may be entitled to a new trial based on faulty admission of evidence. It is vital to the judicial system, because its "principled and just functioning . . . depends on careful observation of the rules that focus attention on the proper grounds of decision." *Beasley*, 809 F.2d at 1279. And it is critical to the appellate courts, because without it we lose the benefit of the trial court's invaluable perspective and insight in evaluating the propriety of its decisions. *Id.* at 1278 ("Trial judges have a comparative advantage because they alone see all the evidence in context"). This is not to say, of course, that the court should explain each and every evidentiary decision; "[j]udges need not explain the obvious, even briefly." *Id*. at 1280. But where, as here,

reasonable minds could disagree as to which exception to Rule 404(b) applies, whether an exception applies at all, and whether the strength of the evidence outweighs its potential for undue prejudice, an explanation is warranted.

Additionally, when the court explains for the attorneys and the record why it is allowing certain Rule 404(b) evidence, that rationale becomes the basis for its limiting instruction.[4] The committee commentary for our court's model Rule 404(b) instruction explains that such evidence may be admissible for purposes such as proof of predisposition, motive, opportunity, intent, preparation, plan, knowledge, identity, presence, or absence of mistake or accident. This list does not include every possible basis for the admissibility of this type of evidence, nor does it suggest which one will necessarily apply. The facts and circumstances of the case will determine on what ground certain evidence is admissible. Here, it is possible that the court believed that all of its stated exceptions of knowledge, intent, opportunity, and lack of mistake applied, but it should have explained why.

---

[4] Our court's model instruction for Rule 404(b) evidence states: "You have heard evidence of acts of the defendant other than those charged in the indictment. You may consider this evidence only on the question of _____. You should consider this evidence only for this limited purpose." *See* Pattern Criminal Federal Jury Instruction for the Seventh Circuit number 3.04, "Proof of Other Crimes or Acts", available at http://www.ca7.uscourts.gov/pjury.pdf (last visited April 11, 2011).

In this case, although the trial court should have explained its decisions, we ultimately conclude that it did not err in admitting the evidence. We use a four-part test to determine whether the district court properly admitted evidence under an exception to Rule 404(b), and will find no error if: (1) the evidence was directed toward a matter in issue other than the defendant's propensity to commit a crime; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *United States v. Dennis*, 497 F.3d 765, 768 (7th Cir. 2007).

### 1.  Captain Almaroad Rule 404(b) Evidence

Applying the four-part admissibility test to Captain Almaroad's testimony and related documents, we find that the court did not err in admitting the evidence. The first prong of the test, which necessitates that the evidence be directed to a matter other than a propensity to commit a crime, is satisfied because Moore was charged with being a felon in possession of a firearm, and he did not stipulate to a prior felony conviction. As a result, the government had to prove, beyond a reasonable doubt, that Moore had been convicted of a prior felony. Had Moore stipulated to a prior felony conviction or agreed to the admission of the certified record of conviction, our analysis would be different because

either would have been properly admitted into evidence, and the details surrounding the drug transactions would not have been admissible. *Old Chief v. United States*, 519 U.S. 172, 174 (1997); *see also United States v. Hampton*, 585 F.3d 1033, 1041 n.2 (7th Cir. 2009).

The second prong of the test is met because selling crack cocaine twice is similar enough to the charged crime of conspiracy to distribute crack cocaine, and the transactions were close enough in time (two years) to be relevant. *See United States v. Wash*, 231 F.3d 366, 371 (7th Cir. 2000) (similarity prong met where prior bad acts and current conviction both implicated defendant in possessing distribution amount of drugs); *United States v. Ruiz*, 178 F.3d 877, 880 (7th Cir. 1999) (two-year gap in time not an inherently unacceptable gap under Rule 404(b)). The evidence consisting of sworn testimony, video, photographs, the crack cocaine that exchanged hands, and a certified record of conviction was more than sufficient to support the jury's finding that Moore committed the prior similar act, so the third part of the test is met.

The final prong of the Rule 404(b) test incorporates Rule 403. *Ciesiolka*, 614 F.3d at 358. Whether it is satisfied in this case is a close question for the same reason that the sufficiency of the evidence prong is so easily met. Under Rule 403, evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice", or because of "needless presentation

of cumulative evidence." Fed. R. Evid. 403.[5] The probative value of the June 2000 drug conviction evidence was high because it went directly to an element of the charged crime of being a felon in possession of a firearm. The threat of unfair prejudice was tempered because the court diligently provided the jury with a Rule 404(b) limiting instruction right before the evidence was offered, and again at the close of all evidence. And "[a]bsent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *United States v. Zahursky*, 580 F.3d 515, 525-26 (7th Cir. 2009) (citation omitted); *see also United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008) ("[W]e assume that limiting instructions are effective in reducing or eliminating unfair prejudice.").

In terms of the "cumulative" consideration portion of the Rule 404(b) test, it appears at first glance that the admittance of Captain Almaroad's testimony, and the video, and the photographs, and the crack cocaine, *and* the certified conviction documents, was excessive. And our review is made more difficult because we do not have any statements by the court explaining its rationale in allowing all of this evidence to be admitted. However, our review of the record ultimately convinces us that the evidence was not cumulative. In most cases a certified record of conviction would be sufficient to prove a prior felony conviction beyond a reasonable

---

[5] Moore also raised a Rule 403 objection at trial.

doubt but here, there was another "Anthony Moore" that lived in the area. The additional evidence was helpful to the jury because it needed evidence that the "Anthony Moore" listed on the state conviction records was the same person that was on trial. Also, considering the context of a relatively involved criminal trial that featured 30 government witnesses and 109 government exhibits, the evidence for the June 2000 transactions does not seem excessive. Since the June 2000 evidence satisfies the four-part Rule 404(b) admissibility test, the court did not abuse its discretion in admitting it.

## 2. Devon Smith Rule 404(b) Evidence

Turning to Smith's testimony, we find that the district court did not err in allowing it into evidence because it also meets the four-part Rule 404(b) test for admittance. Smith testified that he had limited involvement with Moore in 2000 and 2001. Specifically, he said he bought "double-ups" ($20 crack rocks) from Moore in certain increments at a particular location in the city. The evidence was directed toward Moore's intent and knowledge in distributing drugs, which are crucial considerations in establishing the intent necessary for conspiracy to distribute drugs. *See United States v. Green*, 258 F.3d 683, 694 (7th Cir. 2001) (when a defendant is charged with the specific intent crime of conspiracy to distribute drugs, prior drug transactions may be relevant to show knowledge and intent). And here, all four of Moore's witnesses testified that they *never* saw him sell drugs from the house or apartment they lived in or frequented,

so his intent and knowledge were issues at trial. Smith's testimony that he bought crack cocaine from Moore one to two years before the indictment's charged start date of conspiracy to distribute crack cocaine satisfies the similarity and proximity prong. The sufficiency-of-the-evidence prong is met because Smith provided eye-witness testimony featuring specific details about his mode and location in purchasing drugs from Moore. And, finally, the evidence did not violate the final prong of the Rule 404(b) test because it was limited in scope (only 13 lines of question-and-answer trial transcript testimony), and the court offered a limiting instruction before the introduction of the evidence and again at the close of evidence. Although the court should have explained its rationale, it did not abuse its discretion in admitting the evidence of Moore's prior drug transactions under the exceptions to Rule 404(b).

### C. No Error in Admitting Evidence Suggestive of Dog Fighting

Moore contends that the court should not have admitted testimony and documents from Ruth Hughes, who was a supervisor with Jefferson County Animal Control. He asserts that the evidence was unfairly prejudicial because it implicated him in dog fighting, and should have been excluded under Federal Rule of Evidence 403. We find that the district court did not err in allowing the evidence because it was probative of Moore's control over a disputed residence, and not unfairly prejudicial.

Relevant evidence may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. The rule "calls upon the district court to weigh the need for and probative value of the evidence against potential harm that its admission might cause." *Mihailovich v. Laatsch*, 359 F.3d 892, 906 (7th Cir. 2004). Although we ordinarily review a district court's evidentiary rulings under an abuse of discretion standard, we give "special deference" to the district court's findings pursuant to Rule 403, and reverse only when "no reasonable person could take the view adopted by the trial court." *United States v. LeShore*, 543 F.3d 935, 939 (7th Cir. 2008).

On January 12, 2007, the police executed a search warrant of 1110 Prairie Avenue; Moore was not present in the house at the time. During trial, Captain Almaroad testified that guns, ammunition, scales, plastic baggies, and crack cocaine were found within the house. An assault rifle and ammunition were found in the trunk of a broken-down car outside the house. Other witnesses testified that drugs were frequently sold in and around the house, guns were often present within the house, certain individuals had been "jumped" (beaten up) or shot there, and that the house was commonly known as "Murder Ave."

An issue at trial was whether Moore lived in or had control over the house. During the cross-examination of Captain Almaroad, Moore's attorney elicited testimony that no men's clothing, no mail addressed to Moore, and no identification cards belonging to Moore were found

inside the house during the execution of the search warrant, and that other people's fingerprints were found on an assault rifle. When Moore presented his defense, three of his four witnesses testified that they never saw him sell drugs at the house, and that it was Moore's father, not the defendant, who owned it. And in closing argument, Moore's attorney asserted that the government had not met its burden in connecting Moore to the property. In his effort to establish Moore's control over "Murder Ave.", the prosecutor introduced evidence from 12 witnesses. He presented the testimony of drug dealers, drug users, and officers who placed Moore at the house at various times. He introduced the customer record for a utility company, which showed that the service for the house was in Moore's name. The prosecutor also introduced the testimony of Hughes, the employee with Animal Control.

Hughes testified that her job duties included handling "all complaints on abuse. . . . If there's any kind of dog fights or anything, mistreated animals, we answer all those calls." She testified that four pit bulls were recovered by her department from 1110 Prairie in July of 2000. When the prosecutor moved to admit a document that was related to that recovery, Moore's counsel moved to have the document excluded or redacted under Federal Rule of Evidence 403 because it referenced "pit bulls and fighting", and he believed it would "inflame and infuriate the jury." At a sidebar, the prosecutor argued that Moore had previously been given the documents and knew that Hughes was going to be called, yet did not raise the objection in a motion in limine. He

also said he needed to rebut Moore's contention that he did not live at or have control over 1110 Prairie. The court overruled Moore's objection, and the document was published for the jury. The listed name of the owner of the property was "Anthony Moore". Hughes also testified that Moore came to the department's holding facility to claim the dogs. Hughes further testified that five pit bulls were recovered from the same address in July of 2006. This second time, when Moore came to the holding facility to pick up one of the dogs, Moore signed the forms that listed his name as the owner of the dogs. Hughes then asked him if he lived at 1110 Prairie because they thought the house may have been vacant. She said that Moore replied, "that's my residence. I live there."

Moore argues that the evidence was unduly prejudicial because it implicated him in dog fighting and that the prejudice was compounded because the trial occurred approximately five months after professional football player Michael Vick was sentenced to federal prison on charges associated with dog fighting. The government counters that the evidence did not necessarily raise a presumption of dog fighting. And, even if it did, it was not unfairly prejudicial or the error was harmless given the overwhelming evidence of Moore's guilt.

Hughes's testimony undoubtedly raised an inference that the dogs recovered from 1110 Prairie were subjected to dog fighting. Her department was responsible for investigating potential cases of dog fighting, and there were a total of nine pit bulls recovered from 1110

Prairie. However, Hughes's testimony was also highly probative. Of the 12 witnesses the government offered to establish Moore's control over the house, Hughes was the only one who testified to Moore's admission that 1110 Prairie was his residence. And the Animal Control records were one of only two sets of business records that featured both the address of 1110 Prairie and Moore's name on them. The only other document admitted was the customer record from the utility company, which, as Moore's attorney emphasized during his cross-examination of the company's office coordinator, did not necessarily establish Moore's control over the property ("You don't know who made the request for that service?"; "You don't know if somebody called in and asked that it be placed in the name of Anthony Moore?"; "It is possible it could have been put in his name?"; "And it's also possible that the resident there may not have been Anthony Moore, isn't it?"). Given the highly probative nature of Hughes's testimony and related documents, and the relatively minor additional prejudice of introducing an inference of dog fighting to a house that was known for drugs, guns, violence, and was nicknamed, "Murder Ave.", we find that the court did not err in denying Moore's motion to exclude the evidence pursuant to Rule 403.

### D. Motion for Mistrial Based on Juror's Interaction Properly Denied

Moore argues that the court should have granted his motion for a mistrial because a juror encountered one of

his associates at a local sandwich shop during a lunch break, and because she told five of her fellow jurors about the experience afterward. He contends that the jury was compromised because of the incident, the court's subsequent questioning of the jury was insufficient, and the juror's relaying of the experience to her fellow jurors violated the court's order not to discuss the case before deliberations. We reject these arguments because the court's response to the unintentional interaction was proper, and there is no indication in the record that the jury was compromised or that the jury discussed Moore's case before deliberations.

We review a district court's decision on motions requesting a mistrial for an abuse of discretion. *Lane*, 591 F.3d at 927. The trial court "is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial." *United States v. Clarke*, 227 F.3d 874, 881 (7th Cir. 2000). In a criminal case, any private communication, contact, or tampering—directly or indirectly—with a juror during a trial about the matter pending before the jury is presumptively prejudicial. *Remmer v. United States*, 347 U.S. 227, 229 (1954). However, the presumption is not conclusive. The burden rests heavily on the government to establish that the contact was harmless. *Id*.; *United States v. Al-Shahin*, 474 F.3d 941, 949 (7th Cir. 2007). The trial court has substantial discretion in handling extrajudicial juror communications. *Al-Shahin*, 474 F.3d at 949; *United States v. Thibodeaux*, 758 F.2d 199, 202 (7th Cir. 1985). It decides how to structure

its investigation into a potentially harmful communication. *United States v. Warner*, 498 F.3d 666, 680 (7th Cir. 2007). And, depending on the facts before it, it may rightfully decide that no formal hearing or structured voir dire of the jury is necessary at all. *See, e.g., Whitehead v. Cowan*, 263 F.3d 708, 723 (7th Cir. 2001) (hearing unnecessary where incident did not address a matter at issue in trial, provide new information to the jury, or demonstrate a likelihood of affecting deliberations).

With these standards in mind, we turn to the facts of this case. The court advised the jurors on the first day of trial that they needed to notify the court if they had any contact with the attorneys outside of the courtroom, or anything unusual happened. On the third day of trial, one of the jurors, Juror I,[6] reported that during the lunch break, she went to a local sandwich shop, and some of Moore's family and friends were there. As she was leaving the store, one of the persons in the group did not move out of her way, so she had to walk around him. She had lunch with five of her fellow jurors that day, and told them what happened. She then reported the incident to the court. Outside the presence of the rest of the jury and the parties, the court spoke with Juror I. Then, outside the presence of the jury and Moore, the judge told Moore's attorney and the prosecutor what happened and that he had spoken with Juror I privately. The court reported that Juror I "said she didn't feel intimidated or fearful. She wasn't afraid or anything. And

---

[6] Jurors will be referred to by the first initial of their last name.

that she indicated it does not affect her consideration of the case."

The court decided that it would conduct a more thorough voir dire of Juror I regarding the incident, as well as question each of the five jurors she spoke to. Each session occurred in a closed courtroom, on the record, and outside the presence of any other juror or party. Juror I relayed the incident as follows:

> I was at Subway and I had gotten what I had ordered. And while I was paying, I turned around and looked at the door and I saw the people that had been sitting in the back watching what was going on in court close to the door. And when I got my change, I started to the door and the ladies, they was all scattered out. The lady got in one line and the man stepped out, and I couldn't get past there, and he didn't move so I went around him, the ladies, around to the door to go. Got in my car and I left.

The court then conducted a voir dire of each juror that Juror I had lunch with. Each of the five jurors relayed some variation of the fact that Juror I had to walk around Moore's associate to leave the sandwich shop. For example, Juror B testified that she was told that "when [Juror I] got ready to leave the Subway, she had to—the gentleman was in the way so she had to walk around him and around the other women." Juror T said that "the people with [Moore's associate] stepped away and he didn't. And she was—she felt she had to walk around him, but nothing really happened." Each juror stated that

it would not affect his or her ability to remain fair and impartial.

The court then brought Moore, his attorney, and the prosecution back into the courtroom and issued its findings on the incident. It stated that:

> The court is convinced that this jury has not been tainted or compromised. Each one of them said that they would not hold it against [Moore]. And in fact most of them, in fact the ones that were just told this, indicated it was just no big deal, including the one that this happened to.

Moore's attorney moved for mistrial "out of concern for my client's fairness to the trial and the fact that we have so many weapons that have been exhibited . . . . I'm still fearful the jurors, to themselves, may be concealing their own personal feelings about these things and could be fearful. I think we should err on the side of caution." The court denied the motion for mistrial, finding that the jury had not been compromised by the lunchtime encounter. On appeal, Moore argues that the court's voir dire of the jury was insufficient, and that it should have declared a mistrial because the encounter prejudiced the jury against him. He also contends that Juror I's relaying of the experience to her fellow jurors violated the court's instruction not to discuss the case prior to deliberations.

Moore's argument that the court's inquiry was insufficiently tailored does not withstand scrutiny. The court is given the flexibility on whether and how to question a jury following a potentially improper extrajudicial

incident. *Warner*, 498 F.3d at 680. Here, the court chose to conduct a formalized inquiry even though Juror I's interaction with Moore's associate, where no words, gestures, or materials were exchanged, is not of the type that necessarily raises a presumption of prejudice. *See Brown v. Finnan*, 598 F.3d 416, 425 (7th Cir. 2010) (questioning prejudicial effect where comment did not weigh on perceived guilt or innocence, and there was no attempt at persuasion or delivery of extraneous information). The court's decision to individually question Juror I as well as each juror she spoke to was a proper and thorough exercise of its discretion.

Moore's argument that a mistrial was necessary because the jury was compromised must fail because there is no sign of an adverse impact in the record. At the time of the lunchtime incident Moore's attorney speculated that the jurors may have been fearful, and proposed that the court "err on the side of caution" in its reaction, but speculation alone is insufficient to trigger a mistrial. Quite simply, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable.*" Warner*, 498 F.3d at 679 (citation omitted). The jurors stated that "nothing really happened" and that they remained impartial. Their belief that they could deliver a fair and just verdict is supported by their conviction of Moore on two charges, but acquittal on a third. The court did not err in its response to the unintentional encounter, or in finding after its investigation that the jury was not compromised.

Finally, Moore argues that Juror I's relaying of her experience to five of her fellow jurors violated the court's order not to discuss the trial before deliberations. He correctly notes that if the court instructs the jury not to discuss the trial until deliberations, it is juror misconduct if such communication occurs. *Al-Shahin*, 474 F.3d at 949. However, there is no indication in the record that Juror I discussed the facts of the case against Moore, or any notion of perceived guilt or innocence. On the contrary, Juror I's prompt disclosure shows that she was diligent in following the court's instruction to report any outside contact, so the court did not abuse its discretion in denying the motion for mistrial.

### E. Cumulative Error Doctrine Does Not Apply

Moore contends that even if no single error in his trial merits reversal, the cumulative effect of the errors necessitates reversal. He notes that "[c]umulative errors, while individually harmless, when taken together can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law." *United States v. Allen,* 269 F.3d 842, 847 (7th Cir. 2001). To demonstrate cumulative error, Moore must show that (1) at least two errors were committed during his trial; and (2) these errors denied him a fundamentally fair trial. *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000). But because we find that Moore did not identify more than one error, the cumulative error doctrine does not apply.

### III. CONCLUSION

For the reasons stated above, Moore's conviction and sentence are AFFIRMED.